ALLIED ARTISTS PICTURES CORPO-
RATION, Avco Embassy Pictures Corp.,
Buena Vista Distribution Co., Inc., Co-
lumbia Pictures Industries, Inc., Metro-
Goldwyn-Mayer, Inc., Paramount Pic-
tures Corporation, Twentieth Century-
Fox Film Corporation, United Artists
Corporation, Universal Pictures division
of Universal City Studios, Inc., Univer-
sal Film Exchanges, Inc., and Warner
Bros. Inc., Warner Bros. Distributing
Corporation, Plaintiffs,

v.

James A. RHODES, Governor, State of
Ohio, Ted W. Brown, Secretary of State
of Ohio, Vernal G. Riffe, Jr., Speaker,
Ohio House of Representatives, and
Richard F. Celeste, Lt. Governor, Ohio
Senate, Defendants.

No. C–2–78–1031.

United States District Court,
S. D. Ohio, E. D.

June 22, 1979.

Earl F. Morris, Harry Wright, III, Robert W. Trafford, Dixon F. Miller, Porter, Wright, Morris & Arthur, Columbus, Ohio, Louis Nizer, New York City, Alan Dershowitz, Cambridge, Mass., Barbara Scott, William Nix, New York City, for plaintiffs.

William J. Brown, Atty. Gen. of Ohio, Paul D. Eklund, Richard M. Firestone, Gregory E. Young, Asst. Attys. Gen., Columbus, Ohio, for defendants.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

### Preliminary Statement

This is an action for declaratory and injunctive relief by Allied Artists Pictures Corporation and nine other companies engaged in the business of producing and distributing motion pictures. Defendants are James A. Rhodes, the Governor of Ohio; Ted W. Brown and Richard F. Celeste, the former Secretary of State and Lieutenant Governor respectively; and Vernal G. Riffe, Jr., Speaker of the Ohio House of Representatives.

Plaintiffs seek to have declared unconstitutional Sections 1333.05, 1333.06 and 1333.-07 of the Ohio Revised Code (hereafter referred to as the Act). This Act,[1] which became effective on October 23, 1978, regu-

---

1. Sections 1333.05, 1333.06 and 1333.07 of the Ohio Revised Code are as follows:

   § 1333.05 [Definitions.]

   As used in sections 1333.05 to 1333.07 of the Revised Code:

   (A) "Theater" means any establishment in which motion pictures are exhibited regularly to the public for a charge.

   (B) "Distributor" means any person engaged in the business of renting, selling, or licensing motion pictures to exhibitors.

   (C) "Exhibitor" means any person engaged in the business of operating a theater in this state.

   (D) "Exhibit" or "exhibition" means showing a motion picture to the public for a charge.

   (E) "Invitation to bid" means a written or oral solicitation or invitation by a distributor to one or more exhibitors to bid or negotiate for the right to exhibit a motion picture in this state.

   (F) "Bid" means a written or oral proposal by an exhibitor to a distributor, which proposal is in response to an invitation to bid or negotiate and states the terms under which the exhibitor will agree to exhibit a motion picture in this state.

   (G) "License agreement" means any contract between a distributor and an exhibitor for the exhibition of a motion picture by the exhibitor in this state.

   (H) "Trade screening" means the showing of a motion picture by a distributor in one of the

lates the procedures by which motion picture distributors and exhibitors contract for the rights to exhibit motion pictures. The Act prohibits the practice known as "blind bidding" under which the distributors solicit bids for their films from exhibitors before the exhibitors have had an opportunity to "trade screen" or preview the film, § 1333.-06; and also regulates the bidding procedure itself so as to provide exhibitors with liberal notice and inspection rights. § 1333.07.

five municipal corporations within this state having the largest population which showing is open to any exhibitor interested in exhibiting the motion picture.

(I) "Blind bidding" means bidding, negotiating, offering terms, accepting a bid, or agreeing to terms for the purpose of entering into a license agreement prior to a trade screening of the motion picture that is the subject of the agreement.

(J) "Run" means the continuous exhibition of a motion picture in a defined geographic area for a specified period of time. A "first run" means the initial exhibition of a motion picture in a designated geographic area for a specified period of time. A "subsequent run" means any continuous exhibition of a motion picture in a designated geographic area for a specified period of time after the first run.
§ 1333.06 [Certain practices of distributors prohibited; effect on license agreements.]

(A) No distributor shall engage in blind bidding.

(B) No distributor shall condition the granting or execution of a license agreement on a guarantee of a minimum payment to the distributor, if the exhibitor is required by the license agreement to make any payment to the distributor that is based on the attendance or the box office receipts at a theater at which the motion picture is exhibited.

(C) No distributor shall condition the granting or execution of a license agreement on the exhibitor's advancing, more than fourteen days prior to his first exhibition of a motion picture, any money that is to be used as security for the exhibitor's performance of the license agreement or is to be applied to any payments that the exhibitor is required by the agreement to make to the distributor.

(D) Any provision of a license agreement that waives any of the prohibitions of, or fails to comply with, this section or section 1333.07 of the Revised Code is void and unenforceable. Any license agreement that* fails to comply with this section and section 1333.07 of the Revised Code is voidable by the exhibitor, if the exhibitor gives the distributor written notice, prior to the exhibitor's first exhibition of the motion picture that is the subject of the agreement, of his intent to have the agreement voided.
§ 1333.07 [Invitations to exhibitors to bid; inspection, notice.]

(A) If bids are solicited from exhibitors for the purpose of entering into a license agreement, the invitation to bid shall specify:

(1) The number and length of runs to which the invitation to bid applies;

(2) Whether the invitation to bid applies to a first or subsequent run;

(3) The geographic area for each run;

(4) The names of all exhibitors who are being given an invitation to bid;

(5) The date, hour, and location at which the bid is required to be made;

(6) The name and address of the location where the bids will be opened, which location shall be within this state.

(B) If the motion picture that is the subject of a bid has not already been trade screened within this state, the distributor soliciting the bid shall include in the invitation to bid the date, time, and location of the trade screening of the motion picture that is the subject of the invitation to bid.

(C) Every distributor shall furnish to all exhibitors in this state reasonable and uniform notice of all trade screenings that are held within this state of motion pictures that he is distributing.

(D) All bids shall be submitted to the distributor in written form. The distributor or his agent shall open all bids at the same time and in the presence of at least one of the exhibitors, or the agent of an exhibitor, who has submitted a bid.

(E) Any exhibitor, or the agent of an exhibitor, who submits a bid for a particular run of a motion picture may, at reasonable times within sixty days after the bid is opened, examine any bid that is made for the same run of the motion picture by another exhibitor. The exhibitor may inspect the bids even if the distributor rejects all bids that are submitted. Within seven business days after a bid for a particular run of a motion picture is accepted, the distributor shall notify in writing each exhibitor who submitted a bid for that run of the motion picture of the terms of the accepted bid and the identity of the successful bidder. Any bid submitted is nonreturnable.

(F) If a distributor issues invitations to bid for a motion picture, he shall not enter into a license agreement for the exhibition of the motion picture except by means of the bidding process specified in this section. If the distributor rejects all bids submitted pursuant to an invitation to bid, he shall notify all exhibitors who submitted bids that he rejected all bids and shall issue a new invitation to bid.

Plaintiffs ask the Court to declare the Act unconstitutional and to enjoin its enforcement, claiming that the Act: infringes their First Amendment rights of free speech; violates the Commerce, Supremacy and Equal Protection clauses of the United States Constitution; violates the Sherman Antitrust and Federal Copyright Acts; and deprives the plaintiffs of property without due process of law. It is claimed the Court's jurisdiction arises under the above provisions of the Constitution and laws of the United States, and is asserted under 28 U.S.C. §§ 1331(a), 1337, 1338 and 1343(3).

The case is presently before the Court on defendants' joint motion to dismiss plaintiffs'· complaint or alternatively to abstain from assuming jurisdiction. The issues presented by this motion are substantial. They erect before the Court a constitutional threshold which cannot be lightly crossed. Indeed, the Court has paused to give the matter lengthy and deliberate consideration. Upon such consideration the Court has become convinced that defendants' motion is not well taken at this time, and for the reasons set forth below, and with the exceptions noted, must be denied.

### Positions of the Parties

According to plaintiffs' complaint, on June 22, 1978, Amended Substitute House Bill 806 was enacted by the Ohio General Assembly. On that day defendant Riffe, acting as Speaker of the Ohio House of Representatives, and defendant Celeste, as Lieutenant Governor and President of the Ohio Senate, "approved and certified that . . . House Bill 806 had been duly enacted by the Ohio General Assembly." The complaint further recites that on July 24, 1978, defendant Governor Rhodes "approved said Act," and that defendant Brown, as Secretary of State, "accepted said Act for filing as and to become a part of the Revised Code of Ohio." The essence of plaintiffs' complaint is then built on the premise that these actions taken by the above parties to enact what plaintiffs claim

is an unconstitutional statute, are for that reason void, invalid and beyond defendants' power, and constitute a sufficient basis to render those parties proper defendants in an action brought to declare the statute unconstitutional.[2]

The defendants claim that the Court is without jurisdiction over this matter for the reason that they are defendants in name only, the real party defendant being the State of Ohio. Defendants also claim that the complaint fails to demonstrate the existence of an actual and justiciable case or controversy between the parties as required by Article III of the United States Constitution. The Court will now address these issues.

### I. The Eleventh Amendment

The Eleventh Amendment to the Constitution states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Adopted in 1798, the Amendment was enacted in direct response to widespread dissatisfaction with the Supreme Court's decision in *Chisholm v. Georgia*, 2 Dall 419, 2 U.S. 419, 1 L.Ed. 440 (1793), holding that the State of Georgia was amenable to suit in federal court by a citizen of another state. Because the Amendment was intended to reverse the *Chisholm* result it has been interpreted not literally but according to its purpose of restoring to Article III the "fundamental rule of jurisprudence" that "a State may not be sued without its consent." *Ex parte New York*, 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921). Thus the Supreme Court stated:

[T]he entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a state without consent given: not one brought by citi-

---

2. Although, as detailed *infra*, plaintiffs also take the position that the defendant governor and secretary of state possess the power to

enforce this statute, that contention is nowhere contained in plaintiffs' complaint.

zens of another state, or . . . foreign state, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification. *Id.*

See also, *Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934); *Hans v. Louisiana*, 134 U.S. 7, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

■ In accordance with the above principle, it follows that a plaintiff cannot pierce the shield of Eleventh Amendment immunity simply by naming as defendant a party other than the State. Looking to substance rather than form the Supreme Court has decided that such immunity should not depend on "the mere names of the titular parties but [on] the essential nature and effect of the proceeding, as it appears from the entire record." *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Ex parte New York, supra*, 256 U.S. at 500, 41 S.Ct. 588; *Harrison Construction Co. v. Ohio Turnpike Comm.*, 272 F.2d 337, 339 (6th Cir. 1959). Thus if an examination of this proceeding demonstrates that defendants are in fact here only as surrogates for the sovereign State of Ohio, then perforce the Eleventh Amendment shield must apply and bar further action against them. *See, Georgia R. Co. v. Redwine*, 342 U.S. 299, 303–04, 72 S.Ct. 321, 96 L.Ed. 335 (1952).

■ On the other side of the coin, however, the law is equally clear that the Eleventh Amendment will not bar a suit against state officials to enjoin their enforcement of an unconstitutional state statute. This is the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Ex parte Young* has been called not only "one of the cornerstones of our legal system," *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1265 (1978) (Wisdom, J.) (prob. juris. noted, 439 U.S. 1065, 99 S.Ct. 829, 59 L.Ed.2d 30 (1979)); but also, "one of the three most important decisions the Supreme Court of the United States has ever handed down," 17 Wright & Miller, *Federal Practice & Procedure* § 4231, p. 352 (1978). The

Supreme Court has recently and expressly refused to overrule or restrict the *Young* doctrine, in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, n.6, 98 S.Ct. 988, 55 L.Ed. 179 (1978). Neither plaintiffs nor defendants here attack the continuing viability of *Ex parte Young*; however, they hotly dispute its proper application to this case. The Court will now consider this matter and its present implications.

### Ex parte Young

In 1907 the Minnesota legislature passed a law reducing railroad rates and providing very severe penalties for failure to comply with the law. Plaintiffs sued in federal court to enjoin enforcement of the law against the railroads, claiming that the new rates worked to deprive the companies of their property without due process, contrary to the Fourteenth Amendment. Plaintiffs named as a defendant Edward T. Young, Attorney General of Minnesota, seeking to restrain him from enforcing the new rate structure. The federal court issued a preliminary injunction. Young then went to state court where he sought and received a writ of mandamus directing the railroads to comply with the new rates. For this act he was held in contempt, fined and ordered to jail by the federal court. Young then applied to the Supreme Court for a writ of habeas corpus, presenting there the issue whether the suit against him was in reality one against the state, to which the state had not consented, and thus barred by the Eleventh Amendment.

The decision of the Supreme Court on the above issue is now bedrock law. The Court rejected the Eleventh Amendment claim and in doing so created the famous "fiction" by which in certain cases allegedly unconstitutional state legislation may be tested in federal courts:

If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative

character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States. 209 U.S. at 159–60, 28 S.Ct. at 454.

Thus did the court find the suit to be one not against the state, but against the individual, Edward T. Young. Through this artful fiction the court was able to characterize a single act as state action for purposes of the Fourteenth Amendment, and non-state action for purposes of the Eleventh Amendment, and the case thus became the "watershed . . . which sanctioned the use of the Fourteenth Amendment . . . . As a sword as well as a shield against unconstitutional conduct of state officers." *Juidice v. Vail*, 430 U.S. 327, 335, 97 S.Ct. 1211, 1217, 51 L.Ed.2d 376 (1977).

Given the above, the parties in the present case are greatly at odds over the issue whether the defendants, and in particular defendant Rhodes, the Governor of Ohio, can be stripped of his official or representative character in the same manner as was defendant Young, so as to allow plaintiffs' constitutional sword to be used against him. Defendants argue that Governor Rhodes' position is not analogous to that of Attorney General Young for the basic reason that whereas the attorney general in *Young* was vested with the power to collect the challenged fees and to seek heavy fines to enforce the new rate law against the plaintiffs, Governor Rhodes derives no such enforcement power from the new Act challenged here. In fact the Ohio Act contains no provision for state enforcement whatsoever. Defendants maintain that such enforcement power is a prerequisite to *Ex parte Young* applicability.

Plaintiffs on the other hand contend that enforcement power is not necessary, but that if it is, the governor possesses such power under other "general" Ohio law. Crucial to this consideration is the discussion in *Ex parte Young* of an earlier Supreme Court decision, *Fitts v. McGhee*, 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899).

In *Fitts* the Court had invoked the Eleventh Amendment to bar a suit naming a state attorney general as defendant and challenging the constitutionality of a statute regulating bridge tolls. The statute provided for no enforcement power in state officials. The Court held that in the absence of any "special relation" to the challenged statute on the part of the defendant state official, the Eleventh Amendment bar could not be avoided. As the *Young* court summarized the *Fitts* principle:

> As no state officer who was made a party bore any close official connection with the act fixing the tolls, the making of such officer a party defendant was a simple effort to test the constitutionality of such act in that way, and there is no principle upon which it could be done. A state superintendent of schools might as well have been made a party. 209 U.S. at 156, 28 S.Ct. at 452.

Defendants here claim that plaintiffs are doing precisely the above—naming Governor Rhodes and the other public officials as defendants simply to test the constitutionality of the Ohio Act. The *Fitts* court stated that although such a suit

> would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, . . . it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons. 172 U.S. at 530, 19 S.Ct. at 274.

Continuing from this premise derived from *Fitts* in *Young*, defendants emphasize the Supreme Court's position that in order to properly make a state official a party defendant in a suit to determine the constitutionality of a statute, "it is plain that such officer must have some connection with the enforcement of the act . . . ." 209 U.S. at 157, 28 S.Ct. at 453. Defendants claim they have no such enforcement connection in this case, and that therefore plaintiffs' case must fall.

Plaintiffs counter defendants' argument with the following language from *Young* (emphasis added):

It has not, however, been held that it was necessary that such [enforcement] duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed . . . but that may possibly make the duty more clear; if it otherwise exist it is equally efficacious. *The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.*

*Id.* Thus plaintiffs' position is that any general duty of enforcement arising out of Ohio law will suffice to meet the *Fitts* requirement as clarified by *Young*. Plaintiffs purport to find this general enforcement power in Article III, Section 6 of the Ohio Constitution which provides that the governor "shall see that the laws are faithfully executed," and in § 2733.02 of the Ohio Revised Code, which states:

A civil action in quo warranto may be brought in the name of the state against a corporation:

(D) When it has misused a franchise, privilege, or right conferred upon it by law, or when it claims or holds by contract or otherwise, or has exercised a franchise, privilege, or right in contravention of law . . .

■ After carefully considering the matter, the Court is of the opinion, at this stage of the proceedings at least, that the *Ex parte Young* fiction is available to plaintiffs to divest the defendant governor of his "official or representative character" and to place him outside Eleventh Amendment protection. In reaching this conclusion the Court has studied closely the Supreme Court's language in *Ex parte Young*, and is simply not persuaded that the *Young* court meant to limit the fiction to state officers having a clear-cut law enforcement capability. All that *Young* requires, as plaintiffs

point out, is that the official have "some connection with the enforcement of the act . . . ." 209 U.S. at 157, 28 S.Ct. at 453. *Young* unequivocally concedes that a state officer's connection with the enforcement of the challenged act can "[arise] out of the general law . . . so long as it exists." *Id.*

My reading of *Young* and the cases that follow it does not convince me that the thrust of *Young* can be limited to cases in which there is a showing of precise legal machinery which a state official can use in exercising his enforcement connection. As noted above, the *Young* court, distinguishing the *Fitts* case, wrote, "no state officer who was made a party bore any close official connection with the act fixing the tolls." The word "connection" is used. Surely, if the court had intended to limit the fiction to only those officials having *real enforcement power*, the frequent use of the word "connection" is most difficult to explain.

Looking at this troublesome problem another way, if the Ohio Constitution provided that the governor is charged with the duty of *enforcement* of all laws of Ohio, arguably such a provision would be a general grant of enforcement power, and well within even a narrow reading of *Young*. However, absent a constitutionally or statutorily prescribed means to fulfill the enforcement duty, the argument could be made that the governor's enforcement powers are illusory, not real. Given the hypothetical constitutional mandate, however, it would be an extremely narrow view to say that a governor has no "connection" to the enforcement of the laws of Ohio. Since I can discern no real difference in the use of the word "executed" in Article III, Section 6 of the Ohio Constitution, from the use of the word "enforce," I believe that the governor does possess, by virtue of general Ohio law, a "connection" to the enforcement of the Act.

It may be argued that such reasoning over-extends an already illusory fiction or amounts to a fiction upon a fiction. Defendants argue they have no specific en-

forcement function to perform regarding the Act.[3] While that may be true as far as it goes, it is not to say that the governor has no general duty or obligation concerning the Act. It must be remembered that the *Young* doctrine is truly a fiction, and it is erroneous to expect reality from it.

This Court is not the first to find that a governor's general duty to take care that state laws are faithfully executed, as mandated by a state constitution, is sufficient "enforcement" power to allow plaintiffs to invoke the *Young* fiction. For example, in *Federal National Mortgage Association v. Lefkowitz*, 383 F.Supp. 1294 (S.D.N.Y.1974) (three-judge court), plaintiffs named the governor of New York as a defendant in their suit challenging the constitutionality of a state law requiring mortgage investment institutions to pay interest of at least two percent on certain escrow accounts. The governor moved to dismiss, claiming that he had no specific enforcement authority with respect to the challenged law. In denying the motion, the district court examined the *Young* doctrine and decided that the governor's general duty under the New York Constitution to "take care that the laws are faithfully executed" amounted to "[some] connection with the enforcement of the [act]" so as to make him a proper party defendant. *Accord, Johnson v. Rockefeller*, 58 F.R.D. 42 (S.D.N.Y.1973); *Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984 (S.D.N.Y.1970) (three-judge court); *but cf., Coon v. Tingle*, 277 F.Supp. 304 (N.D.Ga.1967) (three-judge court); *Oliver v. Board of Education*, 306 F.Supp. 1286 (S.D.N.Y.1969). Also cited in support of the plaintiffs' position is *City of Altus v. Carr*, 255 F.Supp. 828 (S.D.Texas 1966) (three-judge court), *aff'd per curiam*, 385 U.S. 35, 87 S.Ct. 240, 17 L.Ed.2d 34 (1966). Although *Altus* is instructive, the Court notes that there the state officer moving to dismiss, the attorney general, was vested with specific enforcement power with regard to

water laws of the state, one of which was the challenged statute. Thus *Altus* is not directly apposite to this case, in which the defendant governor has no such specific enforcement power.

In deciding this issue the Court has given careful consideration to the analysis by Judge Friendly of a similar problem in *Gras v. Stevens*, 415 F.Supp. 1148 (S.D.N.Y.1976) (three-judge court). There the court faced a challenge to the constitutionality of certain provisions of a New York domestic relations statute which permitted a wife, but not a husband, to apply to a state court for an order requiring the spouse to pay incurred costs in divorce actions. Among others, the plaintiff named as defendants the state attorney general and governor.

As stated above, the New York governor like the Ohio governor is charged by the state constitution to "take care that the laws are faithfully executed." In rejecting the proposition that this endows the governor with sufficient enforcement power to make him a proper party defendant under *Young*, Judge Friendly read a reasonable limitation into *Young's* resort to "general law" for such power.

> In our view this would extend *Ex parte Young* beyond anything which the Supreme Court intended or has subsequently held.

415 F.Supp. at 1152. Judge Friendly discusses and distinguishes a number of cases, also cited by this Court *supra*, which have found sufficient enforcement power in a governor's duty to see the faithful execution of state laws:

> The cases that have applied the statement first quoted [see quotation from *Young* cited by plaintiffs at p. 566 *supra*] have been concerned with the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual—the regulation of railroad rates as in *Ex parte Young* itself;

---

**3.** However, the Court notes that a governor may resort to his quo warranto powers in "extraordinary" situations involving corporate infringement of public or state interests. *See,* R.C. 2733.02, 2733.04; *State ex rel. Day v.*

*Superior Savings & Loan Assn.*, 25 Ohio St.2d 79, 80, 266 N.E.2d 842, 843 (1971); *State ex rel. Brown v. Regional Public Safety Service Corp.*, 47 Ohio App.2d 300, 353 N.E.2d 851 (C.A. Franklin Cty. 1975).

the forfeiture of civil rights upon imprisonment, *Johnson v. Rockefeller*, 58 F.R.D. 42, 45–46 (S.D.N.Y.1972), *aff'd sub nom., Butler v. Wilson*, 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974); the rules determining access to a position on the ballot, *Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984 (S.D.N.Y.) (three-judge court), *aff'd*, 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970); and water control, *City of Altus v. Carr*, 255 F.Supp. 828, 834–37 (W.D.Texas) (three-judge court), *aff'd* 385 U.S. 35, 87 S.Ct. 240, 17 L.Ed.2d 34 (1966). Even in such cases there is an opposing view as to the propriety of joining a governor as a defendant, see *Coon v. Tingle*, 277 F.Supp. 304, 306–07 (N.D.Ga.1967) (three-judge court) (statute prohibiting employment of females in liquor stores); *Oliver v. Board of Education*, 306 F.Supp. 1286, 1288 (S.D.N.Y.1969) (election procedures for local board of education). However all this may be, we know of no case in which the general duty of a governor to enforce state laws has been held sufficient to make him a proper party defendant in a civil rights action attacking the constitutionality of a state statute concerning matrimonial or other private civil actions. *Id.*

■ Although I disagree with *Gras* insofar as it declines to find *Young* enforcement power in the governor's general duty to see to the execution of state laws, I agree with the *Gras* result. Furthermore, I believe to be accurate Judge Friendly's evaluation that the cases which have permitted a governor to be joined as a defendant concerned the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual. This valid limitation serves to preclude parties from testing the constitutionality of state legislation by simply naming the governor as a defendant, a practice which if unchecked would effectively eviscerate the Eleventh Amendment. Thus, to satisfy the *Young* fiction, as I understand it, not only must there be a state officer who has a connection with the enforcement of the challenged statute, but there must also be a real, not ephemeral, likelihood or realistic potential that the connection will be employed against plaintiffs' interests. Thus in *Gras*, for instance, there was no realistic potential that the governor would have taken any interest in the underlying divorce proceeding or in the challenged statute itself, the constitutionality of which could well have been advocated by the private party seeking its benefits. On the other hand, in cases such as *Federal National Mortgage, Socialist Workers Party* or *Altus*, all *supra*, it was reasonable to believe that the defendant state officers' connection with enforcement of state laws would have been brought to bear upon offending parties. Thus in the Court's view the proper balance between the *Ex parte Young* sword and the Eleventh Amendment shield can be struck only on a case-by-case basis after a searching review of the relationship between the Act, the defendant state officials, and the plaintiffs.

In reviewing the case law, the Court finds it helpful to picture these relationships on a continuum. At one end of the continuum would be cases such as *Gras* in which the challenged statute regulates relationships between private parties, and which creates rights which can be amply protected by private action. In these cases the realistic potential that a state official would intercede to vindicate statutory rights is minute. At the other end of the continuum would lie cases which for example challenge state election laws or voting-district apportionment laws. There, statutes have created rights and relationships of substantial public interest which cannot be readily protected in litigation between private parties. Thus in a case such as *Socialist Workers Party v. Rockefeller, supra*, a case involving a challenge to the New York Election Act, it does not stretch the *Young* fiction too far to make the governor a party defendant by assuming that his general connection to the enforcement of state election laws might potentially be brought to bear on parties violating the law under attack. In fact at this end of the continuum the Court notes that in certain

cases attacking state election laws a plaintiff's decision to name a governor as defendant has gone unchallenged even through review at the Supreme Court level. *E. g., Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

Thus the problem now before the Court becomes that of properly placing this case on the continuum. Defendants would argue that since the Act purports to regulate contractual rights between private parties, namely motion picture distributors and exhibitors, there is no realistic potential that the defendant governor would act to enforce the statutory rights which could be vindicated by private action. Plaintiffs on the other hand would claim that the alleged substantial and immediate impact upon them of the Act is tantamount to direct state regulation which could reasonably require the governor's attention under his general duty to see to the faithful execution of the laws.

One can reasonably take the view—although there is an opposing view—that the Act makes "blind bidding" unlawful in Ohio. Using that as a starting point I believe it can be reasonably maintained that the Act amounts to state regulation of movie producers and distributors doing business in Ohio. Presumably, then, this exercise of the state's regulatory power is designed to implement and serve the public interest of Ohio. The Court is aware that there is no criminal sanction attached to the Act, and also that plaintiffs could possibly await a dispute with an exhibitor and sue, raising there the question of the Act's constitutionality. However, that begs the question in the case at bar. The pertinent question is: does the governor of Ohio, as the chief executive of the state, have an interest in the enforcement of the Act? Or, on the other hand, is this simply an Act near the *Gras* end of the continuum where the public interest is not crucial, the dispute is such that the governor's interest is absent, and the matter can be adequately decided in an action between concerned private parties?

■ The question is difficult; the real thrust of the Act is somewhat obscure on its face. However, in ruling on this motion to dismiss, the Court must view the complaint most favorably for plaintiffs. Thus, in the exercise of great caution, as required in deciding a motion to dismiss, I hold that plaintiffs have alleged facts sufficient to invoke the *Young* fiction and to avoid the Eleventh Amendment bar.[4]

■ Accordingly, defendants' joint motion to dismiss the cause on Eleventh Amendment grounds will be denied as to defendant Governor Rhodes. However, given the reasoning above, the Court cannot find that defendants Brown, Celeste or Riffe have any connection whatsoever with the enforcement of the Act. Accordingly they are protected by the Eleventh Amend-

---

4. Plaintiffs fix a second string to their bow with a more general argument on the meaning of the Eleventh Amendment. Arguing from *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) and *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), plaintiffs claim that the only real bar imposed by the Eleventh Amendment is to retroactive relief in the form of money damages from the state treasury. The inquiry into a state official's enforcement power is relevant, plaintiffs claim, only insofar as it determines who is a proper party defendant in the suit. In other words, plaintiffs take a broad view of *Ex parte Young* and find that through its progeny it stands for the general proposition that unconstitutional state action is not insulated by the Eleventh Amendment from the scrutiny of a federal court.

While the Court understands how such a broad view of the *Young* doctrine might be inferred from the facts of *Milliken* or *Edelman*, neither of those cases gives any explicit support to such a view. The Court does not write on a clean slate in this area of the law. Absent a clear statement by the Supreme Court that it intends to abrogate the Eleventh Amendment whenever state legislation is challenged on constitutional grounds, except when a suit seeks money damages against the state, this Court cannot find a warrant to make the modification of Eleventh Amendment law, as it understands it, that plaintiffs seek. Indeed, the Supreme Court has recently expressly reaffirmed the vitality of the Eleventh Amendment in a non-damages setting. *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3051, 57 L.Ed.2d 1114 (1978).

ment, and defendants' motion to dismiss must be granted as to them. Further, because of the extremely close question presented by this issue, and the caution exercised by the Court as required at this stage of the litigation, the Court's ruling must include a caveat to plaintiffs that the issue raised herein will be reexamined at the close of plaintiffs' case when the law can be applied in a clearer factual setting.

## II. *Case or Controversy*

■ In considering the multi-faceted doctrines which are subsumed under the heading "case or controversy," especially in light of the facts of this case, the Court finds itself in ready agreement with Chief Justice Warren's insight that the two words have "an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government." *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed. 947 (1968). As early as *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803), it was plain that a court has power to declare a statute unconstitutional only when that statute is brought before the court in a case "properly susceptible of judicial determination." Wright, *Federal Courts* § 12 (3d Ed. 1976). Such a case, to be justiciable, must "present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union*, —— U.S. ——, ——, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).[5]

■ The question for this Court in the case at bar is simply whether, as plaintiffs claim, the mere enactment by defendants of a statute which at present adversely affects plaintiffs' rights and interests· is sufficient to raise a justiciable controversy.

Once again the Court must view plaintiffs' claims in their most favorable light. Thus it appears that the provisions of § 1333.06 of the Act absolutely forbid blind bidding at plaintiffs' instance. This interdiction has a direct and substantial impact on plaintiffs' heretofore established business practices. Moreover, provisions of the Act, contained in § 1333.07, also substantially alter the procedures by which plaintiffs distribute their motion pictures. Viewing plaintiffs' complaint most favorably, the Act operates to disrupt plaintiffs' nationally-coordinated distribution system and imposes upon them substantial financial uncertainty.

■ Further, as noted above, the Act is drafted to be self-enforcing; thus the alleged impact upon plaintiffs is immediate and occurs without the active participation of or enforcement by state officers. In such a context a concrete case or controversy may exist, even absent overt adverse action by named defendants. In the Court's opinion an actual threat of enforcement by state officials is not required for justiciability where, as in this case, the statute is mandatory, self-enforcing, and results in immediate economic injury. For example, in *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) plaintiffs challenged the constitutionality of a West Virginia statute which required gas pipeline operators to give preference to in-state customers under certain conditions. Although the statute had only been in force for several days when the suit was brought, and it apparently had yet to be enforced, the Supreme Court found that the case was justiciable:

> Turning to the act, we find that by its first section it lays on every pipe line company a positive duty . . . whose terms are both direct and certain, and to which immediate obedience is command-

5. Defendants argue that the recent decision of the Supreme Court in *Babbitt* should be dispositive on the justiciability issue here. Although the Court finds *Babbitt* instructive, it notes the Supreme Court's admonition there that the difference between an abstract question and a "case or controversy" is one of degree, not

being discernible by any precise test. Taking that to mean that each case must be carefully considered on its facts, the distinctions I find between the *Babbitt* situation and this one prevent this Court from giving conclusive weight to *Babbitt*.

ed. . . . *it prescribes a definite rule of conduct and in itself puts the rule in force.*

262 U.S. at 593, 43 S.Ct. at 664 (emphasis added). *See also, Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (suit to enjoin statute held justiciable 15 months prior to its effective date where its immediate impact resulted in "present and very real" injury to the plaintiffs' business). *See generally,* Comment, 62 Col.L.Rev. 106, 114 (1962).

In *Lake Carriers' Assn. v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972), the court considered a constitutional challenge to a Michigan statute which prohibited the discharge of sewage into state waters and required vessels with marine toilets to be equipped with sewage storage devices. The district court had dismissed the case, finding it non-justiciable. The Supreme Court found to the contrary, stating:

> The immediacy and reality of appellants' concerns . . . depend . . . only on the present effectiveness in fact of the obligation under the Michigan statute to install sewage storage devices. *For if appellants are now under such an obligation, that in and of itself makes their attack on the validity of the law a live controversy, and not an attempt to obtain an advisory opinion.*

406 U.S. at 507, 92 S.Ct. at 1755 (emphasis added). The court went on to find that plaintiffs were faced with the threat of future enforcement of the act which had an immediate coercive impact upon them.

In the case at bar plaintiffs similarly claim they are being coerced into compliance, although here the coercion arises out of the self-enforcing provisions of the Ohio Act. Given the language of the Act, enforcement arguably commenced against plaintiffs upon its enactment. In such a case the Court feels that an actual threat of enforcement by state officials is unnecessary. At this stage of the litigation at least the Court must assume that plaintiffs are presently being injured by the operation of the Act, and therefore the Court finds that a live controversy exists in this case sufficient to give the Court jurisdiction under Article III of the United States Constitution.

Once again, however, the Court makes the above finding with a caveat. The Court has found the justiciability issue to be a close one. Out of the extreme caution required on a motion to dismiss, I have decided to let the matter go forward. However, I intend to carefully scrutinize the evidence presented at trial to ensure that the foundation is established for this Court's jurisdiction under Article III and to ensure that the plaintiffs are not merely attempting to "survey the statute books" of Ohio, *Younger v. Harris,* 401 U.S. 37, 52, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), in order to receive a premature constitutional adjudication of the challenged Act.

III. *Abstention*

As an alternative to their motion to dismiss, defendants argue that the Court should abstain from deciding the issues presented in this case pending a construction of the challenged Act by the Ohio courts. In particular defendants claim that despite the Act's apparently clear prohibition contained in § 1333.06(B) against distributors' conditioning license agreements on certain minimum payment guarantees, such guarantees may in fact be offered *to* distributors by exhibitors, thereby avoiding the Act's prohibition. Likewise defendants claim that the prohibition contained in § 1333.06(C) of the Act against distributor-required advance payments can be circumvented by advance payment agreements offered by the exhibitors. Defendants' position is that if in fact these practices can occur despite the Act, then the impact of the Act claimed by plaintiffs, and its constitutional ramifications, are significantly altered. Therefore, they argue, the Act should be construed initially by the Ohio courts. Defendants also argue that there are several ambiguities inherent in terms used in the language of the Act which require definitive construction.

The Court has carefully considered defendants' arguments on this matter and finds the issue a close one. In reaching its decision the Court notes that the Supreme Court has set out rigid standards defining the circumstances under which a federal court may properly abstain.

Abstention from the exercise of federal jurisdiction is the exception, not the rule. The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.

*Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (citation omitted).

In view of the "extraordinary" nature of such a decision, the Court is not persuaded that abstention is warranted at this time. In speaking of cases appropriate for abstention, the Supreme Court has stated:

Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law. If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise significantly modify the federal claim, the argument for abstention is strong.

*Harris County Comm'rs v. Moore*, 420 U.S. 77, 84, 95 S.Ct. 870, 876, 43 L.Ed.2d 32 (1975). The Court is presently of the opinion that, given its language, construction of the Act by a state court would not avoid the need for a constitutional ruling, nor would it "significantly modify" the federal claims brought here by plaintiffs. If development of the case at trial demonstrates otherwise, however, the Court will not hesitate to alter its ruling accordingly. At present, however, defendants' motion to abstain will be denied.

### Conclusion

In summary, for the reasons and with the reservations stated above, the Court is of the opinion that defendants' joint motion to dismiss must be GRANTED as to defendants Brown, Celeste and Riffe, and DENIED as to defendant Governor Rhodes. Further, upon consideration of defendants' motion to abstain, the Court is not persuaded that abstention is warranted, and the motion will be DENIED.

So ORDERED.