**Ifeanyi Charles Anthony OKPALOBI, doing business as Gentilly Medical Clinic for Women, Plaintiff–Appellee,**

**and**

**Causeway Medical Suite; Bossier City Medical Suite; Hope Medical Group for Women; Delta Women's Clinic; Women's Health Clinic; James Deguerce; A. James Whitmore, III, Intervenors–Appellees,**

**v.**

**Mike FOSTER, Governor of the State of Louisiana; Richard P. Ieyoub, Attor-**

---

ney General of Louisiana;[1] State of Louisiana, Substituted in place of Kenneth Duncan, Treasurer of the State of Louisiana, Defendants–Appellants.

No. 98–30228.

United States Court of Appeals, Fifth Circuit.

Sept. 17, 1999.

---

1. Although the record shows that the Attorney General of Louisiana was named as a party and was served with citation, he does not appear as a defendant on the docket sheet of the district court. Further, although he is named as a party in all of defendants' pleadings, in the injunction orders and on the notice of appeal, he does not appear as a party on the docket sheet in this court. He nevertheless has invoked the appellate jurisdiction of this court and is a party to this appeal.

Sidney M. Bach, Bach & Wasserman, Metairie, LA, for Plaintiff–Appellee.

Priscilla Joyce Smith, Center for Reproductive Law & Policy, New York City, William E. Rittenberg, Rittenberg & Sam-

uel, New Orleans, LA, for Intervenors–Appellees.

Robert B. Barbor, Louisiana Dept. of Justice, Civil Div., Roy A. Mongrue, Jr., Asst. Atty. Gen., Baton Rouge, LA, for Defendants–Appellants.

Before JOLLY, WIENER and PARKER, Circuit Judges.

WIENER and ROBERT M. PARKER, Circuit Judges:

Mike Foster, Governor of Louisiana, Richard P. Ieyoub, Attorney General of Louisiana, and the State of Louisiana (collectively "the State") appeal the district court's order permanently enjoining "the operation and effect" of Louisiana Revised Statutes Annotated, Title 9, Section 2800.12[2] (West Supp.1999)("Act 825" or "the Act"), which makes an abortion provider liable, in tort, to the woman obtaining an abortion for any damage occasioned by the abortion. The district court held the Act unconstitutional and enjoined its enforcement, finding that the Act is unconstitutionally vague and that it imposes an undue burden on a woman's right to seek a pre-viability abortion. We affirm.

## I. PROCEDURAL HISTORY AND STANDARD OF REVIEW

The original complaint of Ifeanyi Charles Anthony Okpalobi ("Dr. Okpalobi") was filed in district court on July 15, 1997. Five health care clinics and two more physicians ("Intervenors") intervened on behalf of Dr. Okpalobi and filed a motion for a temporary restraining order ("TRO") and preliminary injunction to re-strain the operation of Act 825.[3] The State opposed the motion. After a hearing, the district court granted a TRO in an order dated August 14, 1997, one day before the Act was scheduled to take effect.

The district court held a hearing on the Plaintiffs' motion for preliminary injunction on December 10, 1997. On January 7, 1998, the district court issued an order declaring that Act 825 "has the purpose and effect of infringing and chilling the exercise of constitutionally protected rights of abortion providers and woman [sic] seeking abortions," concluding that the Plaintiffs had demonstrated a substantial likelihood of success on the merits of their Fourteenth amendment claim and granting the preliminary injunction. *See Okpalobi v. Foster*, 981 F.Supp. 977, 986 (E.D.La.1998). On February 11, 1998, pursuant to an agreement of the parties, the district court converted the preliminary injunction to a permanent injunction. The agreed permanent injunction contains no express declaratory judgment language, but permanently enjoins the Act "in its entirety for the reasons stated in the granting of the preliminary injunction." Because of the express reference to the earlier order declaring the Act unconstitutional and because the only basis for the injunction articulated is the district court's decision that the Act violates the Constitution, the order before us on appeal of necessity grants the Plaintiffs' request for both declaratory and injunctive relief.

The State timely filed an appeal. We must now determine whether the district court abused its discretion when it declared that Act unconstitutional and permanently enjoined its enforcement. *See Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1102 (5th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 357, 139 L.Ed.2d 278

---

2. "This section, enacted by Acts 1997, No. 825, § 1, as R.S. 9:2800.11, was redesignated as R.S. 9:2800.12, pursuant to the statutory revision authority of the Louisiana State Law Institute." La.Rev.Stat. Ann. 9:2800.12, Historical and Statutory Notes.

3. On appeal, there is no meaningful distinction between the positions taken by Dr. Okpalobi and intervenors. We therefore refer to them collectively as "Plaintiffs" or "Appellees."

(1997). "The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunction relief." *Id.* (internal quotations omitted)(citing *North Alamo Water Supply Corp. v. City of San Juan,* 90 F.3d 910, 916–17 (5th Cir.1996)). The district court's conclusions of law, including the declaration that Act 825 is unconstitutional, are reviewed *de novo. See North Alamo Water,* 90 F.3d at 915.

■■■ The procedural posture in which this case is presented limits our review of the district court's factual findings. The only factual findings before us on review were made in the context of the district court's grant of the Plaintiffs' motion for a preliminary injunction. A preliminary injunction requires the movant, by a clear showing, to carry the burden of persuasion. *See Mazurek v. Armstrong,* 520 U.S. 968, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997). The court found that the Plaintiffs had met their burden of proof, establishing, along with all other requirements for granting a preliminary injunction, a "substantial likelihood of success on the merits." *See Okpalobi,* 981 F.Supp. at 981. This is not the same as holding that the Plaintiffs had established disputed facts as a matter of law. The district court's grant of preliminary injunction, although interlocutory, was immediately appealable. *See* 28 U.S.C. § 1292(a)(1). The State, however, did not appeal it. Rather, the case went forward to final disposition of the Plaintiffs' complaint seeking permanent injunction. Moreover, the parties agreed to the entry of a permanent injunction without further evidence or argument. By its agreement to make the temporary injunction permanent, the State waived any ar-

gument about the factual sufficiency of the record to support a permanent injunction. If the record contains evidence that supports the district court's finding of "substantial likelihood of success on the merits," we cannot hold the findings of fact to be clearly erroneous.

## II. FACTS

The Plaintiffs comprise three physicians and five health care clinics that provide abortion services in Louisiana. *See Okpalobi,* 981 F.Supp. at 980. The Plaintiffs submit that they provide over 80% of all abortions in Louisiana. *See id.* No patient of either the physicians or the clinics appears as a party to this suit. *See id.*

The evidence in the record consists of two affidavits submitted to the district court to support the Plaintiffs' motion for preliminary injunction.[4] The first affidavit was executed by the administrator of Hope Medical Group for Women, a Shreveport Louisiana abortion provider. Hope's administrator asserts that Act 825 "will leave Hope no option but to cease providing abortions to our patients who need pregnancy terminations" because the Act leaves the clinic and its physicians "susceptible to significant liability."

The second affidavit was submitted by a physician who provides abortions in Baton Rouge and New Orleans, Louisiana. He also asserts that if Act 825 takes effect, he would have no choice but to discontinue his abortion practice. "The constant and real threat of large money judgments against me, when I have done no wrong, is not a risk I could reasonably bear."

## III. DISCUSSION

### A. The Act

This case requires us to determine the constitutionality of Act 825, which would

---

4. The record also contains the deposition of a member of the Louisiana House of Representatives, concerning the legislative history of the Act. The deposition was filed on the same day that the district court issued the preliminary injunction. It is not clear whether it was available to the district court in reaching its decision.

have taken effect on August 15, 1997. The Act states:

2900.12 Liability for termination of a pregnancy

A. Any person who performs an abortion is liable to the mother of the unborn child for any damage occasioned or precipitated by the abortion, which action survives for a period of three years from the date of discovery of the damage with a preemptive period of ten years from the date of the abortion.

B. For purposes of this Section:

(1) "Abortion" means the deliberate termination of an intrauterine human pregnancy after fertilization of a female ovum, by any person, including the pregnant woman herself, with an intention other than to produce a live birth or to remove a dead unborn child.

(2) "Damage" includes all special and general damages which are recoverable in an intentional tort, negligence, survival, or wrongful death action for injuries suffered or damages occasioned by the unborn child or mother.

(3) "Unborn child" means the unborn offspring of human beings from the moment of conception through pregnancy and until termination of the pregnancy.

C.(1) The signing of a consent form by the mother prior to the abortion does not negate this cause of action, but rather reduces the recovery of damages to the extent that the content of the consent form informed the mother of the risk of the type of injuries or loss for which she is seeking to recover.

(2) The laws governing medical malpractice or limitations of liability thereof provided in Title 40 of the Louisiana Revised Statutes of 1950 are not applicable to this Section.

LA.REV.STAT. ANN. § 9:2800.12 (West Supp. 1999).

*B. Jurisdiction*

■ None of the parties raised or briefed on appeal any issues concerning our jurisdiction. Nevertheless, we must examine the basis for our jurisdiction *sua sponte. See MCG, Inc. v. Great Western Energy Corp.,* 896 F.2d 170, 173 (5th Cir. 1990).

*1. Eleventh Amendment*

■ The Eleventh Amendment prohibits the federal courts from entertaining "any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The bar imposed by the Eleventh Amendment has been extended, by judicial construction, to suits brought against states by their own citizens. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *see also Edelman v. Jordan,* 415 U.S. 651, 662, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Eleventh Amendment bars suits brought directly against a state, absent the state's consent, irrespective of the nature of the relief sought. *See Hutto v. Finney,* 437 U.S. 678, 700, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *see also Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

■ The Eleventh Amendment does not, however, bar suits seeking declaratory or injunctive relief against state officers. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Young,* the Supreme Court determined that a Minnesota statute setting railway rates and imposing fines and imprisonment for its violation was unconstitutional. *See id.* at 148, 28 S.Ct. 441. The central question presented was whether the plaintiffs could invoke the jurisdiction of the federal courts to enjoin the enforcement of the statute by the state's Attorney General. *See id.* at 149, 28 S.Ct. 441. The Supreme Court, beginning from the premise that states are incapable of authorizing unconstitutional conduct, created the famous fiction that any officer of a state engaging in unconstitutional conduct is no longer acting as an agent of the state and, thus, is no longer

entitled to share the sovereign's Eleventh Amendment immunity from suit. *See id.* at 159–160, 28 S.Ct. 441. Nevertheless,

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that *such officer must have some connection with the enforcement of the act,* or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

*Id.* at 157, 28 S.Ct. 441(emphasis added). Neither the Supreme Court nor the Fifth Circuit has defined the exact nature of the "connection" between a defendant state officer and the enforcement of the statute required by *Ex parte Young.* We therefore are called on to parse the language of and precedents for *Young* and examine the development of Eleventh Amendment jurisprudence from other circuits for persuasive reasoning to determine whether the Eleventh Amendment bars the present action.

*Young* relied on *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), another rate case which held that a suit against individual state officers for the purpose of preventing them, as officers of the state, from enforcing an unconstitutional enactment was not a suit against a state within the meaning of the Eleventh Amendment. *See Young,* 209 U.S. at 154, 28 S.Ct. 441. *Young* noted that there was no special provision in the statute at issue in *Smyth* imposing on the Attorney General the duty to enforce it, but, under his general power, the Attorney General had authority to ask for a mandamus to enforce such or any other law. *See id.* The *Young* defendants objected that a subsequent Supreme Court decision, *Fitts v. McGhee,* 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899), limited this principle by holding that, in the absence of any "special relation" to the challenged statute on the part of the defendant state official, the Eleventh Amendment bar could not be avoided. *See Young,* 209 U.S. at 152–53,

28 S.Ct. 441. *Fitts* went on to note that the state officials in question "were not expressly directed to see to [the statute's] enforcement." *Fitts* at 529, 19 S.Ct. 269. The Supreme Court in *Young* specifically rejected the argument: "The doctrine of *Smyth v. Ames* was neither overruled nor doubted in the *Fitts* Case." *Young,* 209 U.S. at 156, 28 S.Ct. 441.

To the extent that there is tension between *Fitts's* focus on the state officials' express enforcement power and the later articulation in *Young,* we are controlled by the *Smyth* doctrine and the unequivocal holding of *Young* that a state officer's connection with the enforcement of the challenged act can "[arise] out of the general law . . . so long as it exists." *Id.* at 157, 28 S.Ct. 441.

Some courts have interpreted *Young* to stand for the proposition that a Governor's general duty to enforce laws set out in the state's constitution is all the connection the Eleventh Amendment requires. In *Federal Nat'l Mortgage Ass'n. v. Lefkowitz,* 383 F.Supp. 1294 (S.D.N.Y.1974), a district court in New York held that the New York Governor's general duty under the state constitution to "take care that the laws are faithfully executed" was sufficient connection with the enforcement of a law requiring mortgage companies to pay interest on escrow accounts to make him a proper party defendant in a suit challenging its constitutionality. *See id.* at 1298. *Federal Nat'l Mortgage Ass'n* also held that the New York Attorney General's power, pursuant to New York Executive Law § 63(1), to seek injunctions against a person who engages in repeated illegal acts in the transaction of business was a sufficient "connection" to satisfy *Young. See id* at 1296–97.

The Second Circuit later held that the New York Attorney General's duty to support the constitutionality of challenged state statutes, *see* N.Y. Exec. Law § 71 (McKinney 1972), and to defend actions in which the state is "interested," *see* N.Y. Exec. Law § 71 (McKinney 1972) was not

a sufficient connection with New York's durational residency requirement for divorce actions to afford the "exigent adversity" essential to federal court jurisdiction over a constitutional challenge to that statute. *See Mendez v. Heller,* 530 F.2d 457, 460–61 (2d Cir.1976).

Subsequently, another New York trial court attempted to sort out *Young*'s "some connection" requirement. In *Gras v. Stevens,* 415 F.Supp. 1148 (S.D.N.Y.1976), the plaintiff challenged the constitutionality of a provision of the New York domestic relations statute that permitted a wife, but not a husband, to apply for an order requiring the spouse to pay costs in divorce actions. Although the court found that the Governor's duty to "take care that the laws are faithfully executed" in New York's constitution was not a sufficient "connection" to invoke *Young, Gras* acknowledged a number of cases that have found sufficient connection based on a Governor's general duty to enforce state law. In distinguishing those cases, *Gras* explains:

> [These cases] have been concerned with the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual—the regulation of railroad rates as in *Ex parte Young* itself; the forfeiture of civil rights on imprisonment, *Johnson v. Rockefeller,* 58 F.R.D. 42, 46 (S.D.N.Y. 1972), *aff'd sub nom., Butler v. Wilson,* 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974); the rules determining access to a position of the ballot, *Socialist Workers Party v. Rockefeller,* 314 F.Supp. 984 (S.D.N.Y.)(three judge court), *aff'd,* 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970); and water control, *City of Altus v. Carr,* 255 F.Supp. 828, 834–37 (W.D.Texas)(three judge court), *aff'd,* 385 U.S. 35, 87 S.Ct. 240, 17 L.Ed.2d 34 (1966) ... However all this may be, we know of no case in which the general duty of a governor to enforce

state laws has been held sufficient to make him a proper party defendant in a civil rights action attacking the constitutionality of a state statute concerning matrimonial or other private civil actions.

*Id.* at 1152. The district court in *Gras* likewise rejected the Attorney General as an appropriate defendant, noting that in spite of the fact that he was bound to support the constitutionality of the challenged New York statute and to defend actions in which the state is interested, he was not threatening to deprive the plaintiff of anything at the time the action was commenced. *See id.* at 1151.

An Ohio district court in *Allied Artists Pictures Corp. v. Rhodes,* 473 F.Supp. 560 (S.D.Ohio 1979), *aff'd* 679 F.2d 656, 665 n. 5 (6th Cir.1982), examined *Gras,* as well as the earlier cases *Gras* relied on, and concluded that the distinction made in *Gras* was sound.[5] That is, a Governor may be joined as a defendant in cases concerning "the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual." *Id.* at 568. *Allied* involved a constitutional challenge to a statute that affected the rights of business entities in the movie industry to make contracts. The *Allied* court, after what has been termed "clearly the most thoughtful analysis of the *Ex parte Young* connection with enforcement requirement to date," *Nat'l Ass'n for the Advancement of Colored People v. State of California,* 511 F.Supp. 1244, 1255 (E.D.Cal.1981), concluded that the proper balance between *Young* and the Eleventh Amendment can be struck only on a case-by-case basis, after a review of the relationship between the act, the defendant state officials, and the plaintiffs. *Allied* described a continuum, with *Gras*-type challenges to domestic relations laws on one end and election law challenges, such as *Socialist Workers Party v. Rockefeller,* 314 F.Supp. 984

---

5. The *Allied* court noted its disagreement with *Gras* insofar as *Gras* declined to find *Young* enforcement power in the Governor's general duty to see to the execution of state laws, but went on to agree with the *Gras* result. *See Allied,* 473 F.Supp. at 568.

(S.D.N.Y.)(three judge court), *aff'd*, 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970), on the other. The *Allied* court held that the act in question "amounts to state regulation of movie producers and distributors ... designed to implement and serve the public interest of Ohio." *Allied*, 473 F.Supp. at 569. Although there were no criminal sanctions attached to the act and the plaintiffs could have awaited a private suit to test its constitutionality, *Allied* held that the Governor of Ohio had an interest in the enforcement of the Act sufficient to invoke the *Young* fiction. *See id.* The court also considered the state officials' failure to challenge the suit on Eleventh Amendment grounds relevant to the inquiry, although not controlling. *See id* at 569.

The Sixth Circuit approved the reasoning and affirmed the result of the district court in *Allied*. *See Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 665 n. 5 (6th Cir.1982). "Even in the absence of specific state enforcement provisions, the substantial public interest in enforcing the trade practices legislation involved here places a significant obligation upon the Governor to use his general authority to see the state laws are enforced." *Id.* The Sixth Circuit found that the Governor of Ohio had sufficient connection with the enforcement of the Act that he fell outside the scope of eleventh amendment protection and could be sued for declaratory and injunctive relief. *See id.* "Were this action unavailable to the plaintiffs, they would be unable to vindicate the alleged infringement of their constitutional rights without first violating an Ohio statute requiring a significant change in their business conduct. Such a result is clearly what the doctrine in *Ex Parte Young* was in part designed to avoid." *Id.*

■ From these cases we glean the following two part test for resolving the question of "connection" necessary for Eleventh Amendment purposes. First, we determine what powers the defendants wield to enforce the law in question. Second, we discern the nature of the law and its place on the continuum between public regulation and private action.

■ Act 825, on its face, does not direct the State or its officers to do anything. Rather, the Act envisions private law suits brought by abortion patients against abortion providers in state courts, leaving the judicial branch of the state government with the most direct involvement in enforcing the Act. Therefore, one argument goes, the plaintiffs' quarrel is with Louisiana courts rather than the Governor. Louisiana has chosen, however, to give its Governor and Attorney General a role in the enforcement of all of its laws. The Louisiana Constitution, Article 4, § 5(A) provides:

> The governor shall be the chief executive officer of the state. He shall faithfully support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed.

■ The Attorney General's powers and duties are set out in Article IV, § 8 of the Louisiana Constitution, which provides:

> As necessary for the assertion or protection of any right or interest of the state, the attorney general shall have authority (1) to institute, prosecute, or intervene in any civil action or proceeding[.]

Further, if the Attorney General neglects or declines to take an appeal from a judgment in a civil case in which the state has an interest, the Governor has the right and the duty to do so. *See State ex rel. Livingston v. Graham*, 25 La.Ann. 629 (1873); *see also State ex rel. Strauss v. Dubuclet*, 25 La.Ann. 161 (1873). From these provisions, we conclude that the Governor and the Attorney General have powers and duties under state law sufficient to meet the minimum requirements under the Eleventh Amendment. We also note that neither the Governor nor the Attorney General contends that he should be dismissed as a defendant because he lacks the requisite connection to the Act to invoke

Eleventh Amendment protection. *See Allied*, 473 F.Supp. at 569.

Next, the Plaintiffs insist—and we agree—that the purpose and effect of the Act is to prevent women from obtaining legal abortions in Louisiana: The Act is a thinly-veiled attempt to regulate and interfere with a right protected by the United States constitution. We place such interference on the *Allied* continuum near the end closest to laws respecting the voting rights of citizens, rather than alongside procedural aspects of domestic relation law. It also falls close to the motion picture statute in *Allied* which, while ostensibly creating a private or civil cause of action, was found by the court to have been "designed to implement and serve the *public* interest of the state." *Allied*, 473 F.Supp. at 569.

Because the connection between the Attorney General and Governor and the Act is sufficient and because the Act regulates the availability of abortions, we hold that making the Governor and the Attorney General of Louisiana defendants in this suit does not violate the Eleventh Amendment.

### 2. *Article III, Case or Controversy requirement*

In a closely related—indeed, overlapping—inquiry, we must determine whether there is a justiciable controversy between the Plaintiffs and the defendant state officials. Article III, § 2 of the United States Constitution defines federal judicial power in terms of nine categories of "cases" and "controversies," imposing constitutional limits on federal judicial power.

■ One vehicle a party may use to invoke federal case or controversy jurisdiction is a suit seeking declaratory relief. *See* 28 U.S.C. § 2201 ("any court of the United States, on the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration"). The purpose of the Declaratory Judgment Act is to afford added remedy to one who is uncertain of his rights and who desires early adjudication thereof without having to wait until his adversary should decide to sue and to act at his peril in the interim. *See McGraw–Edison Co. v. Preformed Line Products Co.*, 362 F.2d 339 (9th Cir. 1966). Although the Plaintiffs sought declaratory and injunctive relief, the claim for declaratory relief can stand on its own for purposes of the case or controversy jurisdictional requirement. *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974)(when plaintiffs' claim for injunctive relief settled, the case or controversy requirement was satisfied by the remaining claim for declaratory relief.)

The Plaintiffs pleaded for declaratory relief against the Governor of Louisiana and the State of Louisiana.[6] The intervenors pleaded for declaratory and injunctive relief against the Governor and the Attorney General of Louisiana. The district court declared the statute in question unconstitutional and enjoined its enforcement, without singling out any particular defendant against whom the injunction was to operate.

A suit for declaratory and injunctive relief is the classic procedural mechanism for challenges to the constitutionality of state abortion statutes. *See, i.e., Roe v. Wade*, 410 U.S. 113, 120, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)(seeking declaratory and injunctive relief against the district attorney of Dallas County, Texas); *see also Doe v. Bolton*, 410 U.S. 179, 185, 93 S.Ct. 739, 35 L.Ed.2d 201 (1975)(seeking declaratory and injunctive relief against Georgia's Attorney General, a district attorney and a chief of police).

Abortion case law has developed in the context of challenges to state statutes that

---

**6.** Plaintiffs originally named the Governor and the Treasurer of Louisiana as defendants, but later dismissed all claims against the Treasurer and substituted the State of Louisiana in his stead.

impose criminal liability on abortion patients and providers. Today we must determine whether precedent affording federal case or controversy jurisdiction over claims for declaratory and injunctive relief is applicable when the state abortion statute under attack creates a private, civil cause of action, rather than criminal liability, and whether the Governor and Attorney General of Louisiana are the appropriate defendants.

 First, the civil, as opposed to criminal nature of the statute makes no difference to our jurisdiction over claims for declaratory relief. *See Hopwood v. State of Texas,* 78 F.3d 932, 938 (5th Cir.1996)(exercising jurisdiction over claim for declaratory relief that the state university admission policy was unconstitutional). Less obvious is whether the State of Louisiana and its Governor are the proper defendants in plaintiffs' claims for injunctive relief. We turn for guidance first to *CIGNA Healthplan of La., Inc. v. State of Louisiana,* 82 F.3d 642 (5th Cir.1996). In that case, a Health Maintenance Organization and health insurer brought suit against the State of Louisiana, *ex relatione* the Attorney General, seeking declaratory and injunctive relief, asking the federal court to declare a Louisiana statute concerning who may serve as a preferred provider of health care services unconstitutional and to enjoin its enforcement. *See id.* at 646. We exercised jurisdiction, affirming both the declaratory and injunctive relief, although the order had the effect of enjoining both the Attorney General's enforcement actions and private enforcement actions, much as the injunction in this case has the affect of enjoining private enforcement actions. *See id.* Although not a perfect fit because of the dual mechanism for the insurance statute's enforcement, we find *CIGNA* instructive in that the opinion makes no distinction between private and official enforcement.

We cannot rest there, however, because the question of the *Ex parte Young* "connection" between the defendants and the Act that we knocked down in the Eleventh Amendment skirmish has circled around and now attacks our rear flank, incarnated as a case or controversy question. Even if the Governor and the Attorney General are proper defendants, the argument goes, if the "complaint fails to allege, or the plaintiff fails to prove, that defendant state officers have ever taken or threatened to take any action with respect to a state statute then there is no 'actual controversy' within the Declaratory Judgment Act, and there is 'no case or controversy' within Article III." *Shell Oil Co. v. Noel,* 608 F.2d 208, 213 (1st Cir.1979). The exception to this general rule, articulated in *Allied,* is that "the mere enactment by the defendants of a statute which at present adversely affects plaintiffs' rights and interests is sufficient to raise a justiciable controversy." *Id.,* 473 F.Supp. at 570. Because the act in question was self-enforcing, that is, it had a direct and substantial coercive impact on plaintiffs' heretofore established business practices, and, moreover, because the alleged impact on plaintiffs was immediate and occurred without the active participation of or enforcement by state officers, the court held that a concrete case or controversy existed, even absent overt adverse action by the named defendants. *See id.*

In *1st Westco Corp. v. School Dist. Of Philadelphia,* 6 F.3d 108 (3rd Cir.1993), the Third Circuit dismissed the Pennsylvania Attorney General and Secretary of Education as defendants for lack of case or controversy when the challenged statute was actually enforced by local school district officials. The officials' "general duty to uphold the laws of Pennsylvania, standing alone, will not suffice to render them proper defendants in this lawsuit." *Id.* at 115. *1st Westco* relies, however, on *Rode v. Dellarciprete,* 845 F.2d 1195, 1209 n. 9 (3rd Cir.1988), for the proposition that "[a] plaintiff challenging the validity of a state statute may bring suit against the official who is charged with the statute's enforcement only if the official has either en-

forced, or threatened to enforce, the statute against the plaintiffs." *Rode,* however, cited *Allied* with approval, but distinguished *Allied* on the basis that *Allied* was concerned with a primarily self-enforcing statute, but *Rode* was not. *See Rode,* 845 F.2d at 1208. The self-enforcing nature of a challenged statute has been considered an important factor in other circuits, as well. In *American Booksellers Association v. Commonwealth,* 802 F.2d 691 (4th Cir.1986), Virginia argued that booksellers could not challenge a new state antipornography law until someone broke it and was punished. The Fourth Circuit rejected the argument and the Supreme Court agreed with the Fourth Circuit.

> We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of the statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.

*Virginia v. American Booksellers Association,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

Reversing a dismissal of a declaratory judgment action for failure to present a justiciable case or controversy, the Fourth Circuit explained: "Mobil's predicament—submit to a statute or face the likely perils of violating it—is precisely why the declaratory judgment cause of action exists." *Mobil Oil Corp. v. Attorney General,* 940 F.2d 73, 74 (4th Cir.1991). "Public policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution." *Id.* at 75.

We are convinced that Article III does not require a plaintiff to plead or prove that a defendant state official has enforced or threatened to enforce a statute in order to meet the case or controversy requirement when that statute is immediately and coercively self-enforcing. The Plaintiffs' assertion that they will be forced to discontinue offering legal abortions to patients because of the untenable risks of unlimited civil liability under an unconstitutional Act, sets forth a judicable case or controversy between the plaintiffs and the Governor and Attorney General of Louisiana.[7]

**7.** The dissent approaches this difficult question from a third angle, stating in footnote 1 that the "injunction can have no legal effect against women not part of this suit. Furthermore, Louisiana's courts are not bound by our court's determination that a particular Louisiana law is unconstitutional (aside from dealing with the specific parties who were subject to the federal court judgment)." We view the dissent's first statement as a misleading non sequitur and its second statement as erroneous. On the first point, it is immaterial that the subject injunction cannot be enforced against women who are not party to the suit because the injunction is aimed at the State of Louisiana through its responsible officials. The injunction does not prohibit a woman from filing such a suit; it does make her suit frivolous and dismissable *ab initio* by enjoining the State from enforcing claims based on the unconstitutional statute. As for the bind-

ing effect on Louisiana courts, the treatise cited in support of the dissent's footnote, Richard H. Fallon, et al., Hart and Wechsler's the Federal Courts and the Federal System 209 (4th ed.1996), does not support the dissent's assertion. In discussing a federal court's ruling on overbreadth of a state criminal statute, the treatise merely points out that if a state court later interprets the state statute less broadly than the federal court, it may avoid the problem of overbreadth identified by an earlier federal court decision. Although Louisiana Courts are free to disagree with our *interpretation* of their statute, neither the treatise cited, nor any other authority of which we are aware, allows state courts to ignore federal court interpretations of the U.S. Constitution, much less to enforce a state statute that has been declared unconstitutional *vel non* by a federal court.

### 3. Plaintiffs' standing to pursue their patients' rights

The Plaintiffs brought suit alleging that Act 825 violates their own Fourteenth Amendment rights, as well as those of their patients. The State argued in district court that the Plaintiffs lack standing to pursue their patients' rights. The district court, rejecting that position, held that, "[g]iven the relationship between the intervenors and their patients, and given the obstacles which prevent pregnant women from challenging this statute, including a desire for privacy and the imminent mootness of their claims, intervenors may assert third-party standing and raise the right of their patients." *Okpalobi*, 981 F.Supp. at 980.

The district court addressed the issue of standing within the context of determining whether the Plaintiffs were entitled to a preliminary injunction. The district court's inquiry was thus governed by the standard applicable to ruling on a motion to dismiss for want of standing. For purposes of such a motion, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). As noted above, however, the parties agreed to convert the preliminary injunction into a permanent injunction. "In a case that proceeds to final judgment, the factual allegation supporting standing (if controverted) must be supported adequately by the evidence adduced at trial." *Walker v. City of Mesquite*, 169 F.3d 973, 978–79 (5th Cir.1999). We conclude that, under either standard, the Plaintiffs have standing.

There are two distinct standing questions encompassed by the district court's order. The first, which the State did not dispute in the district court, is whether the Plaintiffs suffered an injury in fact. *See Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Injury in fact requires the allegation of (1) an injury that is concrete, particularized and actual or imminent; (2) a causal connection between the alleged injury and the defendant's conduct; and (3) a likelihood that a favorable decision will redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Plaintiffs allege that the challenged statute exposes them to unavoidable and substantial civil liability that will force them to cease performing abortions in Louisiana. Further, they allege that the Act will impair and restrict their practice of medicine. It is well established that a claim of direct economic harm visited on abortion providers by a statute is adequate to satisfy the injury-in-fact requirement. *See Singleton*, 428 U.S. at 113, 96 S.Ct. 2868. We hold that the Plaintiffs have alleged an injury in fact, including components of causation and redressability, sufficient to make their claim a case or controversy subject to the federal courts' Article III jurisdiction. *See id.* To the extent that the Plaintiffs assert their own rights, it is clear that they have standing.

The second aspect of standing, which the State did contest in the district court but not on appeal, is the Plaintiffs' standing to assert the constitutional rights of their patients who seek abortions. We must therefore determine whether, as a prudential matter,[8] the Plaintiffs are proper proponents of those particular rights. *See Singleton*, 428 U.S. at 112, 96 S.Ct.

---

8. In addition to constitutional standing requirements, the court has fashioned principles of judicial restraint, which have come to be know as "prudential" considerations. *See Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir.1994). These self-imposed constraints are intended to ensure the proper role of the courts in our tripartite system of government by avoiding judicial resolution of abstract questions that would be more appropriately addressed by other governmental institutions. *See id.* (citing *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

2868. We start with the general rule that, ordinarily, one may not claim standing to vindicate the constitutional rights of some third party. *See Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The Supreme Court, however, has carved out an exception to that rule in the context of physicians claiming third party standing to assert their patients' rights to a pre-viability abortion. Beginning with *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)(holding that physicians have standing to assert the constitutional rights of patients to whom they prescribed contraceptive devices) and culminating in *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)(holding that physicians have standing to contest a statute excluding certain abortions from medicaid benefits)(plurality opinion), the Supreme Court developed a framework for analyzing the standing of physicians who seek to vindicate their patients' rights to reproductive freedom. "It generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Singleton,* 428 U.S. at 118, 96 S.Ct. 2868; *see also Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 845, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)(allowing abortion providers to challenge a state statute on behalf of third party women who seek abortion services). The physician's standing in *Singleton* was based on the examination of two factual elements. First, the Court considered the relationship of the litigant to the person whose rights he seeks to assert. *See id.* at 114, 96 S.Ct. 2868. "If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Id.* at 114–115, 96 S.Ct. 2868. The Court held that "the constitutionally protected abortion decision is one in which the physician is intimately involved. Aside from the woman herself,

therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision." *Id.* at 117, 96 S.Ct. 2868.

Second, the *Singleton* Court considered whether there was some genuine obstacle preventing the third party from asserting her own rights. *See id.* at 115–116, 96 S.Ct. 2868. The Court noted two obstacles to a woman's assertion of her own rights in an abortion case. "She may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit." *Id.* at 117, 96 S.Ct. 2868. "A second obstacle is the imminent mootness ... of any individual woman's claim. Only a few months, at the most, after the maturing of the decision to undergo an abortion, her right thereto will have been irrevocably lost[.]" *Id.*

Later, in *Powers v. Ohio,* a majority of the Supreme Court reiterated the framework set out by the *Singleton* plurality:

> We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relationship to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers,* 499 U.S. at 410–11, 111 S.Ct. 1364 (citations omitted).

 When we apply the factors dictated by the Supreme Court, we find no meaningful distinction between the Plaintiffs here and the physicians whose standing was affirmed in *Singleton.* They share the same patient-provider relationship. The obstacles for the absent women are identical.

The State attempts to distinguish this case from *Singleton* by characterizing Act 825 as a strengthening of Louisiana's in-

formed consent statute. *See* LA.REV.STAT. ANN. 40:1299.35.6 (West Supp.1999)("Woman's Right to Know Act"). We understand the State's argument to pit a woman's interest in obtaining full disclosure of information prior to making a decision to undergo an abortion against the abusive practice of physicians who would maximize the number of abortions performed (and thereby increase revenues) by obtaining consent for an abortion from a patient who would decline the procedure were she fully informed.

This argument is reminiscent of the State of Illinois's argument that was rejected by the Seventh Circuit in *Charles v. Carey,* that "to permit doctors to raise the rights of their patients in this circumstance permits . . . the wolves to guard the flock of sheep." *Charles v. Carey,* 627 F.2d 772, 779–80 n. 10 (7th Cir.1980) (quotation omitted). We likewise reject the argument. The only evidence before the district court on the informed consent issue is the affidavit of A. James Whitmore, III, M.D., who states that, "[m]y diligent and good-faith efforts to inform my patients of all risks of the [abortion] procedure as required by Louisiana law simply do not shield me from liability for the performance of an abortion." As in *Carey,* the evidence in this record does not present a conflict between a physician's economic interest and a woman's interest in full disclosure. *See id.*

Yet a somewhat more difficult question remains. The Louisiana statute under attack provides the absent woman litigant with a cause of action that will be lost to her if the Plaintiffs prevail. Thus, we must ask whether the absent women's potential for recovery of a sizable money judgment under Act 825 distinguishes this case from *Singleton*'s general rule allow-

ing physicians to assert their abortion patients' right to choose a pre-viability abortion.

This question requires us to examine the nature of the relationship between a plaintiff and a third party that is required by *Singleton* and its progeny. *See Singleton,* 428 U.S. at 114, 96 S.Ct. 2868. The relationship must be such that the plaintiff is "fully, or very nearly, as effective a proponent of the right" as the third party. *Powers,* 499 U.S. at 413, 111 S.Ct. 1364. In analyzing the closeness of the relationship between the litigant and the third party, the *Powers* Court considered the commonality and congruence of the two parties' interests. *See id.* at 413–414, 111 S.Ct. 1364; *see also Canfield Aviation, Inc. v. National Transp. Safety Board,* 854 F.2d 745, 748 (5th Cir.1988)("courts must be sure that the litigant and the person whose rights he asserts have interests which are aligned")(citing *Singleton,* 428 U.S. at 114–15, 96 S.Ct. 2868). We must also keep in mind the fundamental goal of the standing inquiry: ensuring that litigants have a concrete stake in the outcome of the proceedings such that the issue will be framed properly.[9] *See Harris v. Evans,* 20 F.3d 1118, 1123 (11th Cir.1994).

The State argues that, because Act 825 grants women a cause of action against abortion providers, including the Plaintiffs, there is not a sufficient congruence of the Plaintiffs' interests with the absent women's interests to grant the Plaintiffs' third-party standing. The State's argument falls wide of the mark. The focus of our standing inquiry is whether the third-party plaintiffs will adequately represent the absent women's constitutional rights. The State, however, does not contend that the Plaintiffs cannot serve as effective proponents of women's constitutional right to an

**9.** We must not, however, conflate third party standing, which allows a plaintiff with an injury in fact to serve as a proponent of another party's constitutional rights, with procedural mechanisms that allow a litigant to actually represent an absent party's interests, which require much tighter identity of inter-

ests. *See, e.g., Society of Separationists, Inc. v. Herman,* 959 F.2d 1283, 1288 (5th Cir.1992)(setting out the requirements for an association to bring suit on behalf of its members); *see also,* FED.R.CIV.P. 23 (requiring commonality and typicality of claims or defenses as prerequisites to class action).

abortion. Neither does the State assert or offer any evidence either that the Plaintiffs have somehow misframed the constitutional argument or that the absent women would construct their challenge to Act 825 differently.

To the contrary, the essence of the State's argument is that the Plaintiffs will represent the women's constitutional rights too vigorously, *i.e.*, that the Plaintiffs will strenuously argue that Act 825 constitutes an undue burden on woman's right to obtain an abortion or is unconstitutionally vague, even though some women might prefer to retain the cause of action granted in Act 825 regardless of its effect on their constitutional rights. We will not deny standing to the Plaintiffs on the speculation that some women might not want to assert their constitutional rights. The general rule, as formulated by the Supreme Court in *Singleton*, is that physicians have standing to raise challenges to laws regulating abortion based on the constitutional rights of their patients because they can adequately represent the patients' interest. The State has offered no persuasive reason for deviating from that rule.

Furthermore, as we conclude that the district court's determination that Act 825 will drive a substantial portion, if not all, Louisiana abortion providers out of business, we are forced to conclude that women have no meaningful opportunity to recover under Act 825. For, if a woman cannot get an abortion in Louisiana, she cannot be damaged by an abortion provider in Louisiana; and if she cannot be damaged in Louisiana by an abortion provider, she will never have a cause of action under Act 825. We are then left with the Supreme Court's guidance in *Singleton*, which in the circumstances of this case, dictates that the Plaintiffs have the requisite commonality and congruence with their patients' interests to establish standing to assert their right to make abortion decisions free of undue burden by the State of Louisiana. *See Powers*, 499 U.S. at 411, 111 S.Ct. 1364.

### 4. Scope of the injunction

■■■■ Federal Rule of Civil Procedure 65(d) teaches that injunctions are "binding only on the parties to the action, their officers, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." The question whether the present injunction can prevent a woman, not a party to this suit, from filing an action in Louisiana State Court invoking the remedies of Act 825 was not raised in the district court or on appeal. Because potential questions about the scope of the injunction are not jurisdictional, we may not address them. *See United States v. Bigler*, 817 F.2d 1139, 1140 (5th Cir.1987)("This court has repeatedly ruled that it will not consider issues that were not raised before the trial court, and, *a fortiori*, that it will not consider issues that are not raised by the litigants on appeal except when they undermine the court's jurisdiction."(footnotes omitted)).

### C. Standard of proof

The parties dispute the proper standard of proof when a plaintiff asserts a facial challenge to a statute imposing restrictions on abortion. The district court noted the apparent tension between *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)(stating that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid") and *Casey*, 505 U.S. at 895, 112 S.Ct. 2791 (stating that abortion regulation is facially invalid if "in a large fraction of cases in which [it] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion"). The district court then declared itself bound by our pronouncements that *Salerno* provides

the proper standard for a facial challenge. *See Okpalobi,* 981 F.Supp. at 982.

On appeal, the parties point out that the Fifth Circuit jurisprudence on this question is not a model of clarity. *Compare Barnes v. Moore,* 970 F.2d 12, 14 n. 2 (5th Cir.1992)(holding that *Casey* did not overrule *Salerno* ), *with Sojourner T v. Edwards,* 974 F.2d 27 (5th Cir.1992)(striking down a statute banning abortions as clearly unconstitutional under *Casey,* even though it allowed abortions to save the life of the mother and therefore arguably passed muster under *Salerno* ). We decline to address any internal inconsistency in this area of Fifth Circuit jurisprudence because, regardless of whether Act 825 is tested under *Salerno* or under *Casey,* the Act is unconstitutional on its face. *See Causeway Medical Suite v. Ieyoub,* 109 F.3d 1096, 1104 (5th Cir.1997)(declining to resolve the *Casey /Salerno* standard of proof question because the statute in question failed under either test).

*D. Undue burden*

■ Because a woman has the right to choose to have an abortion before viability, legislation restricting abortions before viability must not place an undue burden on that right. *See Sojourner T,* 974 F.2d at 30 (citing *Casey,* 505 U.S. at 878, 112 S.Ct. 2791). " 'An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.' " *Id.* (quoting *Casey,* 505 U.S. at 878, 112 S.Ct. 2791). Thus, under *Casey* and *Sojourner T,* we are directed to examine (1) the purpose and (2) the effect of Act 825. As the *Sojourner T /Casey* test for undue burden is disjunctive, a determination that either the purpose *or* the effect of the Act creates such an obstacle is fatal.

*1. Purpose*

*a. The Inquiry*

The *Casey* Court provided little, if any, instruction regarding the type of inquiry

lower courts should undertake to determine whether a regulation has the "purpose" of imposing an undue burden on a woman's right to seek an abortion. Other than setting forth the above-stated test, the Court added only that: "[a] statute with this purpose [placing a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability] is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Casey,* 505 U.S. at 877, 112 S.Ct. 2791.

■ We are not without guidance, however, as abortion law is not the only realm of jurisprudence in which courts are required to question whether a measure has been adopted for an impermissible purpose. Such an inquiry is also mandated in both voting rights and Establishment Clause cases. In those cases, the Supreme Court has instructed that we should typically afford a government's articulation of legislative purpose significant deference. *See, e.g., Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). Nevertheless, we are not to accept the government's proffered purpose if it is a mere "sham." *Edwards v. Aguillard,* 482 U.S. 578, 586–87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *see also Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (noting avowed purpose not sufficient to satisfy Establishment Clause inquiry). More specifically, in conducting its impermissible purposes inquiries, the Court has looked to various types of evidence, including the language of the challenged act, its legislative history, the social and historical context of the legislation, or other legislation concerning the same subject matter as the challenged measure. *See, e.g., Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207, (1996) (voting rights case in which Court examined shape of proposed congressional district created by legislation and state's admission in preclearance procedures and before district court that race motivated

creation of district); *Edwards,* 482 U.S. at 594, 107 S.Ct. 2573 ("A court's finding of improper purpose behind a statute is appropriately determined by the statute on its face, its legislative history, or its interpretation by a responsible administrative agency"). It is to such evidence that we must turn to discern whether Act 825 passes constitutional muster under the purpose prong of *Casey*'s undue burden test.

Relying on the Supreme Court case, *Mazurek v. Armstrong,* 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997), and the Tenth Circuit case, *Jane L. v. Bangerter,* 102 F.3d 1112 (1996), the State asserts that successfully challenging an abortion statute's purpose is "quite difficult" absent a State's admission of improper motive. In *Mazurek,* the Supreme Court held that a Montana statute restricting the performance of abortions to licensed physicians was not adopted with the impermissible purpose of interfering with a woman's constitutional right to obtain an abortion. *Mazurek,* 520 U.S. at 972–76, 117 S.Ct. 1865. In so doing, the Court rejected the plaintiffs' argument that the lack of medical evidence that the Montana law would protect a woman's health demonstrated that the law was based on an impermissible purpose, quoting its earlier statement in *Casey* that "[o]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others." *Id.* at 973, 117 S.Ct. 1865 (quoting *Casey,* 505 U.S. at 885, 112 S.Ct. 2791). The Court similarly discounted the involvement of anti-abortion groups in the drafting of the law. *Id.* Finally, the Court emphasized that, in light of the Court's repeated holdings that a State may restrict the performance of abortions to physicians, the Montana law clearly did not have the *effect* of creating a substantial obstacle to a woman's right to seek an abortion before the fetus attains viability. *Id.* at 974–75, 117 S.Ct. 1865. The Court concluded that "there is simply no evidence that the legislature intended the law to do what it plainly did not do." *Id.* at 974, 117 S.Ct. 1865.

In *Jane L,* the Tenth Circuit held unconstitutional a Utah law that equated viability with twenty weeks gestational age as measured from conception because, *inter alia,* the law had the impermissible purpose of usurping the physician's responsibility for determining fetal viability and, thus, providing a vehicle for challenging the holding of *Roe v. Wade. Jane L,* 102 F.3d at 1116–17. As evidence of this purpose, the court relied on the legislature's establishment of an abortion litigation trust account, the law's blatant disregard of the Supreme Court's "repeated directive" that viability is a matter for an attending physician to determine, and the State's admission in its appellate briefs that the law was "intended to prevent the nontherapeutic abortion of a nonviable fetuses after twenty weeks because in the State's view women who seek such abortions have waited too long." *Id.* at 1116–17.

The State has missed the import of these two cases—whether they are read separately or together. Neither *Mazurek* nor *Jane L* indicates either that (1) for a court to hold that a measure has the impermissible purpose of placing an undue burden on a woman's right to an abortion, the legislature actually has to admit to such a purpose or (2) indicia of improper legislative purpose, such as statutory language, legislative history and context, and related legislation, are irrelevant to the purpose prong of the "undue burden" inquiry. In *Mazurek,* the Supreme Court simply rejected as insufficient evidence of improper purpose two types of evidence not relevant here and similarly discounted by the Court on other occasions—medical data indicating that nonphysicians are capable of performing abortions safely and the involvement of certain lobbying groups in the legislative process. More impor-

tantly, in attempting to glean whether the Montana statute's purpose was improper, the Court examined the language and requirements of the challenged statute in light of existing precedent—a traditional inquiry and one particularly useful here. Similarly, although the Tenth Circuit in *Jane L* obviously relied on the fact that the state admitted to an improper purpose in its appellate brief, the court also rests its conclusion that the Utah legislature adopted the measure for a forbidden purpose on the fact that the act on its face denied physicians the discretion granted them under well-established precedent.

In short, in *Mazurek*, the Supreme Court highlights specific types of evidence that are clearly insufficient to establish improper purpose; in *Jane L*, the Tenth Circuit affirms the obvious that, if the state admits to an improper purpose in adopting an abortion measure, that measure cannot pass constitutional muster under the undue burden test; and both cases reconfirm that the established methods for assaying a legislature's purpose are valid in the abortion context. It is those methods on which we rely in determining whether Act 825 has the purpose of placing a substantial burden on a woman's right to obtain an abortion.

### b. Act 825

We have noted above that the State contends that the purpose of Act 825 is to encourage a physician to inform a woman of all the risks associated with having an abortion. The Act's plain language refutes such a contention. Contrary to the State's assertions, the cause of action contained in Act 825 simply does not hinge on what or how much information a physician provides to a woman prior to performing an abortion. The Act's operative language provides, without any reference to the issue of informed consent, that "[a]ny person who performs an abortion is liable to the mother of the unborn child for any damage occasioned or precipitated by the abortion...." LA.REV.STAT. ANN.

§ 9:2800.12(A). Damage is defined to include "injuries suffered or damages occasioned by the *unborn child* or mother." LA.REV.STAT. ANN. § 9:2800.12(B)(2) (emphasis added). The Act later adds that "[t]he signing of a consent form by the mother prior to the abortion *does not negate this cause of action*, but rather reduces the recovery of damages to the extent that the content of the consent form informed the mother of the risk of the type of injuries or loss for which she is seeking to recover." LA.REV.STAT. ANN. § 9:2800.12(C)(1) ("Reduction of Damages/Informed Consent Provision") (emphasis added).

Thus, the Act provides a cause of action (1) to women who have had an abortion (2) against the physician who performed the abortion (3) for any damage caused by the procedure to the woman or the "unborn child"—a cause of action that (fatally, as seen below) contains no standard of care, no mens rea requirement, and no indication whatsoever regarding the steps a physician may take to avoid liability (other than to cease and desist from performing abortions). The issue of informed consent only enters the picture to reduce, not bar, damages regarding types of injuries of which the physician informed the woman prior to the abortion. Like its operative clause, the Act's "Reduction of Damages/Informed Consent" provision offers no guidance to a physician as to what he can do to satisfy Act 825's non-existent standard-of-care and state-of-mind requirements. In short, Act 825's structure and language put the lie to the State's insistence that the legislation is designed merely to enhance the information furnished to women seeking abortions.

The State's explanation of Act 825's purpose appears even more disingenuous when read *in pari materia* with the Louisiana Woman's Right to Know Act (the "Woman's Right to Know Act"), LA.REV. STAT. ANN. § 40:1299.35.6 (West Supp. 1999), the measure that the State argues Act 825 is intended to supplement. That

act (1) specifies in a comprehensive list the information that a physician must furnish to a woman seeking an abortion, LA.REV. STAT. ANN. § 40:1299.35.6(A)(5)(a) (stating purpose of Act to "[e]nsure that every woman considering an abortion receive [sic] complete information on her alternatives and that every woman submitting to an abortion do [sic] so only after giving her voluntary and informed consent to the abortion procedure"), and (2) provides that "[a]ny physician who complies with the provisions of [the Right to Know Act] may not be held civilly liable to his patient for failure to obtain informed consent to the abortion...." LA.REV.STAT. ANN. § 40:1299.35.6(H). When Act 825's Reduction of Damages/Informed Consent language that grants a woman a cause of action for damage caused to her or her "unborn child" by an abortion is viewed in conjunction with the Woman's Right to Know Act, which denies a woman the ability to recover for damages for injuries of which she was informed before an abortion, it is undeniable that the provision is designed not to supplement the Woman's Right to Know Act, but to ensure that a physician cannot insulate himself from liability by advising a woman of the risks, physical or mental, associated with abortion. Like the district court, we cannot avoid the conclusion that the State's proffered legislative purpose simply is not credible.

Given the deference due to state legislation, the question of whether Act 825 fails constitutional muster exclusively because it was adopted for an improper purpose might be close. We are not, however, confronted with such a situation. To the contrary, if Act 825 were to go into effect, it undoubtedly would drive Louisiana's qualified and responsible abortion providers out of business, thereby imposing an undue burden on a woman's right to seek an abortion. Thus, we are faced with the converse situation of that confronted by the Supreme Court in *Mazurek*. To paraphrase the Court, there is significant evidence that the legislature intended the law

to do exactly what it would do were it to go into effect.

### 2. Effect

The evidence shows that the Plaintiffs, who currently provide approximately 80% of all abortions in the state, will be forced to discontinue their abortion practice if Act 825 goes into effect. The district court found that the Act constitutes an undue burden because it "sets a standard no physician can meet and creates a climate in which no provider can possibly operate," thereby significantly reducing the number of abortion providers in Louisiana. *Okpalobi*, 981 F.Supp. 977, 983–84. The district court's finding is not clearly erroneous. A measure that has the effect of forcing all or a substantial portion of a state's abortion providers to stop offering such procedures creates a substantial obstacle to a woman's right to have a previability abortion, thus constituting an undue burden under *Casey*. *See Planned Parenthood v. Miller*, 63 F.3d 1452, 1465 (8th Cir.1995) (holding criminal and civil penalty provisions of abortion measure was unconstitutional because provisions would unconstitutionally chill physicians' willingness to provide abortions). As our conclusion that Act 825 will have such an effect is intimately linked to our determination that the Act is unconstitutionally vague, we proceed without pause to consider this issue.

### E. Vagueness

#### 1. Duty of Care

Due process prohibits laws so vague that persons "of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Smith v. Goguen*, 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (citations omitted). Vague laws offend due process in two respects. First, they fail to provide the persons targeted by the statutes with "a reasonable opportunity to

know what conduct is prohibited[10] so that [they] may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Second, by failing to provide explicit standards for those who apply them, vague laws "impermissibly delegate basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned,* 408 U.S. at 108–109, 92 S.Ct. 2294.

 A vague law is especially problematic, and the standard of a court's review is therefore more stringent when, as here, "the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin,* 439 U.S. 379, 391, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (citations omitted). A vague law that chills the exercise of a constitutional right will succumb to a facial challenge "even when [the law] could have had some legitimate application." *Id.* In *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1979), the Supreme Court specifically rejected the contention that a statute should not be held unconstitutionally vague on its face unless it is vague in all its applications. *See Kolender,* 461 U.S. at 359 n. 8, 103 S.Ct. 1855. Thus, the standard-of-proof question, *see Salerno,* 481 U.S. 739, 107 S.Ct. 2095 (1987), is not a factor in deciding the State's challenge to the district court ruling on vagueness.

The Supreme Court has invalidated laws that alter the standard of care a physician owes an abortion patient on vagueness grounds because of the potential for chilling the providing of services. In *Colautti*

*v. Franklin,* the Supreme Court held impermissibly vague a Pennsylvania abortion statute requiring a physician to adopt a particular standard of care whenever the physician determined that a fetus was viable or "there [was] sufficient reason to believe that the fetus may be viable." *Colautti,* 439 U.S. at 391, 99 S.Ct. 675. The Court emphasized that, while "viable" and "may be viable" presumably had different meanings, a physician could not know from the statute what they were. The law provided no guidance. "Instead, it condition[ed] potential . . . liability on confusing and ambiguous criteria," and was therefore impermissibly vague. *Id.* at 394, 99 S.Ct. 675.

 Here, the Plaintiffs prevailed in district court after asserting that Act 825 imposes an "invisible duty of care" on doctors. It is unclear, they argued, what, if anything, a physician could do to satisfy the Act's requirements and thereby escape liability under the Act. The district court found that the Plaintiffs had demonstrated "a substantial likelihood of success of showing that the standard of care in Act 825 is unconstitutionally vague because it fails to provide the abortion provider with fair warning of what legal standard will be applied and of what conduct will incur civil liability." *See Okpalobi,* 981 F.Supp. at 982–83.

The State attempts to rebut the district court's vagueness finding by characterizing the statute as a necessary adjunct to the Woman's Right to Know Act. *See* LA.REV. STAT. ANN. § 40:1299.35.6. Relying not on evidence in the record but on a 1996 Notre

---

10. The void-for-vagueness doctrine has been employed most often to strike down laws that impose criminal sanctions. *See, e.g., Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)(striking down a statute imposing civil and criminal penalties against abortion providers who fail to comply with statutory requirements). Even though the imposition of criminal penalties requires a statute to provide an even higher level of certainty, the doctrine is not limited to the crimi-

nal context. *See Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)(applying void for vagueness doctrine in civil context and holding that an ordinance that regulated the business of selling drug paraphernalia was not void for vagueness because the law was sufficiently clear.)

Dame Law Review article,[11] the State contends that such necessity arises from many forces, including, *inter alia,* the facts that there are fewer abortions being performed, and there is increased competition for patients among abortion providers. Further, without citation to any authority or evidence, the State contends that a reasonable patient probably would not be aware of the risks of post-abortion psychological injuries due to the suppression of this information by what the State characterizes as "paternalistic" doctors.

The Woman's Right to Know Act requires a physician to inform the woman of "the proposed abortion method and those risks (including risks to the woman's reproductive health) and alternatives to the abortion that a *reasonable patient* would consider material to the decision.... " LA.REV.STAT. ANN. § 40:1299.35.6(B)(1)(a)(emphasis added). The State contends that the Woman's Right to Know Act focuses on the reasonable patient, while Act 825 imposes a "reasonable doctor" standard of care, thus augmenting, but not contradicting, the earlier statute.

This analysis is without foundation in the language of Act 825, which does not reference any standard of care, either reasonable patient or reasonable doctor. Rather, it specifically states that informed consent will *not* negate the cause of action, but will only reduce the recovery of damages. LA.REV.STAT. ANN. § 9:2800.12(C)(1).

It is far from clear from the language of the Act that an abortion provider can escape liability under the Act by providing the woman with even the most comprehensive information concerning the risks she faces in choosing an abortion. We agree with the district court's finding that it is impossible to tell what conduct will incur liability under the act. We therefore conclude that Act 825 is unconstitutionally vague.

**11.** Thomas R. Eller, *Informed Consent Civil Actions for Post–Abortion Psychological Trau-*

### 2. *Strict liability*

Under the heading "strict liability," the district court found that Act 825 "appears" to provide for automatic recovery by a woman on a showing that her unborn child was aborted. *See Okpalobi,* 981 F.Supp. at 986. "A consent form which indicates the physician informed the woman that the fetus might die, would not, under the statute's wording, negate the cause of action." *Id.* The district court concluded that the litigation this vague statute is certain to foment will chill or even kill the willingness of physicians to perform abortions, and that this resulting effect imposes an undue burden on women seeking abortions in Louisiana. *See id.*

A strict liability statute, in the context of criminal law, imposes a sanction for an unlawful act without requiring a showing of criminal intent. *See United States v. Garrett,* 984 F.2d 1402, 1410–11 (5th Cir. 1993). In tort law, one who sells a product in a defective condition unreasonably dangerous to the consumer is strictly liable for damage caused to the consumer by the product, even if the seller exercised all possible care in the preparation and sale of his product. *See Gray v. Manitowoc Co., Inc.,* 771 F.2d 866 (5th Cir.1985); *see also* Restatement (Second) Torts, § 402A. In both contexts, strict liability encompasses legal consequences that flow from an act regardless of the total absence of wrongful intent on the part of the actor. When considering the constitutionality of statutes regulating abortion, strict liability concerns are raised by laws that lack the element of intent, which is so necessary to protect physicians who perform abortions reasonably and in good faith from civil and criminal liability. *See Summit Medical Assocs., P.C., v. James,* 984 F.Supp. 1404, 1447 (M.D.Ala.1998) (citing "perils of strict liability" and holding "where, as here, the

*ma,* 71 Notre Dame L.Rev. 639 (1996).

specter of medical expert disagreement conjoins with a statute imposing strict criminal and civil liability for an erroneous medical determination, the result could very well be a profound chilling effect on the willingness of physicians to perform abortions") (quotations omitted). The Supreme Court has recognized that "the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea." *Colautti*, 439 U.S. at 395, 99 S.Ct. 675.

On appeal, the State argues that the district court's interpretation of this portion of the statute is erroneous. The State asserts that there is no recovery on behalf of the fetus that is born dead or aborted since there is no survival action available to the mother. According to the State's interpretation, "[i]f the mother consents to the abortion, short of malpractice which leads to the wrongful death of the fetus before the abortion is performed, which action survives for one year only, there can be no liability for the death of the fetus." State's brief at 25. The State does not take the position, nor is there any basis for the argument, that Act 825 includes a scienter requirement.

The language of the Act belies the position taken by the State in this appeal that physicians face no liability for the death of an aborted fetus. Damage is defined in the statute to include "all special and general damages which are recoverable in an intentional tort, negligence, survival or wrongful death action *for injuries suffered or damages occasioned by the unborn child or mother*." LA.REV.STAT. ANN. § 9:2800.12(B)(2) (emphasis added). An unborn child is an injured person for purposes of a wrongful death action in Louisiana. *See Wartelle v. Women's and Children's Hosp., Inc.*, 704 So.2d 778, 785 (La. 1997). Therefore, the State's argument that Louisiana provides no survival action in the abortion context is unavailing.

We conclude that the Act's lack of scienter requirement creates a strict liability statute. Strict liability exacerbates vague-ness, making unfathomable to a physician who is attempting to conform his behavior to the dictates of the law while performing legal abortions just what he must do or not do to comply. Further, strict liability chills the inclination of physicians to provide abortions and thus inflicts an undue burden on Louisiana women's right to choose to have an abortion. *See Women's Med. Prof. Corp. v. Voinovich*, 130 F.3d 187, 203–06 (6th Cir.1997) (holding Ohio abortion statute's medical emergency and medical necessity exceptions to ban on dilation and extraction abortions unconstitutionally vague); *Miller*, 63 F.3d at 1463–1465 (holding South Dakota abortion statute that made physician strictly liable for violation of statute's parental-notice, mandatory-information, and medical-emergency provisions was unconstitutionally vague and constituted undue burden).

### F. Unborn child

The district court was troubled by the Act's provision allowing damages for "injuries suffered or damages occasioned by the unborn child or mother," LA.REV.STAT. ANN. 9:2800.12(B)(2), because Act 825 defines "unborn child" as "the unborn offspring of human beings from the moment of conception through pregnancy and until termination of pregnancy." LA.REV.STAT. ANN. 9:2800.12(B)(3). The district court held:

> The classification of a fetus as an "unborn child" in the statute at issue appears to violate the Supreme Court's holdings in *Roe [v. Wade*, 410 U.S. 113, 159, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973),] and *Casey* [505 U.S. 833, 112 S.Ct. 2791 (1992) ]. Accordingly, there appears to be no set of circumstances in which the application of this statute, as written with this definition of "unborn child," would be constitutional.

*Okpalobi*, 981 F.Supp. at 985.

The State argues on appeal that a post-viability fetus is an unborn child whom the State has a legitimate interest in protecting as long as it does not unduly burden a

woman's choice of an abortion. Consequently, the State contends, some circumstances exist under which the statute can be applied without violation of the Constitution, citing *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Because the statute cannot withstand constitutional scrutiny on other grounds, and because we have determined that this is not an appropriate case for cleaning out our admittedly messy standard-of-proof drawer, *see Causeway*, 109 F.3d at 1104, we need not and therefore do not reach the problems presented by the Act's definition of unborn child.

## IV. CONCLUSION

Based on the foregoing, we hold that Act 825 is unconstitutional in its entirety and affirm the district court's order permanently enjoining "the operation and effect" of the Act.

AFFIRMED.

E. GRADY JOLLY, Circuit Judge, dissenting:

I respectfully dissent because of the elementary and fundamental errors that the majority has made in its reaction to a statute plainly aimed at making medical practice more difficult for abortion doctors. The statute may well constitute an unfair legislative act, but that legislative unfairness cannot be corrected by an unconstitutional judicial act. In sum, this case presents no case or controversy under Article III of the Constitution and, consequently,

we have no constitutional authority to decide its merits.

The majority has affirmed an injunction that apparently enjoins no individual but instead enjoins "the operation and effect of Act 825." A court, however, does not enjoin a statute. A statute itself cannot operate to effect any result; an injunction enjoins defendants who are attempting to enforce or apply the statute.[1] Yet, there are indeed named defendants in this case—the State of Louisiana and its governor. Therein lies the problem: the defendants who are sued in this case play absolutely no role in the acts complained of or in "the operation and effect of Act 825." The defendants have never sought to enforce or apply the statute; nor will they ever do so; indeed, they have no authority to do so. An injunction against the defendants is therefore meaningless.

This statute gives women who have suffered injury during an abortion procedure a cause of action against their doctors. Thus, the statute contemplates injured women as plaintiffs, suing abortion doctors as defendants. Yet, there is not a single affected woman involved in this litigation. No doctor has been sued under the statute. Consequently, no court—the only entity with governmental powers under Act 825—has ever applied the statute against any person. Instead, several abortion doctors and clinics have brought this suit[2]—purporting to represent the interests of women—while the State of Louisiana and its governor have been named as defendants.[3] Although suing these defendants

---

**1.** Although the district court opinion suggests that the judgment operates universally against all who would claim its benefits, an injunction operates only to enjoin those persons involved in the lawsuit. *See* Fed.R.Civ.P. 65(d). The injunction can have no legal effect against women not part of this suit. Furthermore, Louisiana's courts are not bound by our court's determination that a particular Louisiana law is unconstitutional (aside from dealing with the specific parties who were subject to the federal court judgment). Because "state courts and lower federal courts stand in a coordinate rather than a hierarchical relationship," Louisiana courts may choose to

view the majority's opinion as persuasive precedent, or they may not. *See generally*, RICHARD H. FALLON, ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 209 (4th ed.1996).

**2.** The abortion clinics and Dr. Whitmore are intervenors, but for simplicity I refer to them, along with Dr. Okpalobi (the initial plaintiff), collectively as the "plaintiffs" throughout this dissent.

**3.** Although both the State of Louisiana and Governor Foster (in his official capacity) have been named as defendants, there is in effect

may present an expedient way to arrange for an opinion on the constitutionality of Act 825, the majority has disregarded the limits of our own power imposed by Article III of the Constitution and the Eleventh Amendment. This error has caused the majority to act beyond its constitutional authority and simply to issue an advisory opinion. I respectfully dissent.

## I

### A

The standing doctrine represents "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The constitutional core of the standing doctrine contains three elements. *Id.* First, the plaintiffs must show that they have suffered or are about to suffer an "injury in fact." *Id.* Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)) (ellipses and brackets in original). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon*, 426 U.S. at 38, 96 S.Ct. 1917). If any one of these three elements is absent, the parties have brought something less than an Article III case or controversy before the court.

only one defendant in this case. The state acts only through its officials, and the only official named was the governor. Thus, when I only refer to the defendant governor, that reference includes the State of Louisiana.

At the beginning of this lawsuit, both Governor Foster and Treasurer Duncan were named, in their official capacities, as defendants. Dr. Okpalobi, the original plaintiff, named the treasurer as a defendant because Dr. Okpalobi pressed a Takings Clause claim.

### B

It is indisputable that the plaintiffs' claimed injury is not "fairly traceable" to any action of the governor. Not only does the plaintiffs' theory lack a "causal connection between the alleged injury and the conduct complained of," but *the plaintiffs have not even suggested that any act of the defendants in this suit has caused, or will cause, an injury to them.* The State of Louisiana and its governor have no role in the "enforcement" of the civil tort statute. Like any other tort statute, Act 825 is only triggered by a private party suing another private party. Therefore, the imminent injury complained of would be the result of unknown, injured women bringing tort suits against the plaintiff doctors and clinics. The defendants here play no role in the matter; the governor will *never* sue the plaintiffs under the statute nor otherwise *ever* apply or enforce the statute against the plaintiffs. Any injury "results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 42, 96 S.Ct. 1917.

In response to this point, the majority points to the following provision of Louisiana's Constitution:

The governor shall be the chief executive officer of the state. He shall faithfully support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed.

La. Const. of 1974, art. IV, § 5(A). The majority thus concludes that the plaintiffs' claimed injury results from the actions of the state and its governor because the

The treasurer was, apparently, named as a defendant in an attempt to secure an injunction ordering the treasurer to pay money out of the state treasury. Dr. Okpalobi later amended his complaint to substitute the State of Louisiana for Treasurer Duncan. The plaintiffs have never explained any threatened, or even conceivable, action that either the governor or the state itself might take to "enforce" Act 825.

governor is charged with the general duty faithfully to execute Louisiana's laws. Under Act 825, however, neither the governor nor any other state official has any duty to do anything. Nor does the governor have any authority to prevent a private plaintiff from invoking the statute. Consequently, an injunction against the governor (or the state for whom he acts) is utterly meaningless. Indeed, the majority's reasoning in this respect has been rejected by the Supreme Court and every circuit court to address the point.

Long ago, the Supreme Court rejected the majority's reasoning in *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). The plaintiffs in *Muskrat* attempted to challenge the constitutionality of a federal statute by suing the United States. The Supreme Court recognized that the United States, acting as a defendant, had no interests adverse to the plaintiffs' interests: the suit thus did not present an Article III "Case" or "Controversy." To understand how the Court rejected the reasoning applied by the majority in this case, it is helpful briefly to recount the legislative enactments that led to the suit in *Muskrat*.[4]

During the early part of this century, Congress sought to de-centralize land ownership within various Native American tribes. Before 1902, several tribes, including the Cherokee Nation, owned the land of their members communally. In 1902, however, Congress passed legislation that converted the ownership of the land from communal ownership to individual ownership. The legislation thus allotted a certain portion of the communally-owned land to each living member of the Cherokee Nation born before September 1, 1902. Sometime thereafter, the tribal council of the Cherokees requested that their children born after September 1, 1902, but before March 4, 1906, also receive scheduled allotments of land. Congress granted this request and passed legislation in 1906 that allowed for this expansion of the class of persons receiving property. This expansion, of course, reduced the share of those members of the class described in the 1902 act. Sensing that this situation might pose constitutional problems, Congress enacted further legislation in 1907 that gave "William Brown and Levi B. Gritts, on their own behalf and on behalf of all other Cherokee citizens" the right to sue the United States "in the court of claims to determine the validity" of the 1902 legislation. *Muskrat*, 219 U.S. at 350, 31 S.Ct. 250 (quoting the 1907 Act). Under this Act of Congress, Brown and Gritts—who had received allotments under the 1902 Act—brought a suit against the United States challenging the constitutionality of the 1906 Act.

The Supreme Court ordered that the suit be dismissed for lack of jurisdiction for failure to present a "Case" or "Controversy" under Article III. *Muskrat*, 219 U.S. at 361, 31 S.Ct. 250. The Court noted that the United States was not a proper party to the suit because the United States had "no interest adverse to the claimants," and that any ruling on the merits would constitute an advisory opinion. At the heart of its opinion, the Court stated:

> It is true the United States is made a defendant to this action, but it has no interest adverse to the claimants. The object is not to assert a property right as against the government, or to demand compensation for alleged wrongs because of action upon its part. The whole purpose of the [1907] law is to determine the constitutional validity of this class of legislation [i.e., the 1906 act], in a suit not arising between parties concerning a property right necessarily involved in the decision in question, but in a proceeding against the government in its sovereign capacity, and concerning which the only judgment required is to settle the doubtful character of the legislation in question. Such

---

4. The legislation is described in *Muskrat*, 219 U.S. at 348–51, 31 S.Ct. 250, and *Gritts v.* *Fisher*, 224 U.S. 640, 642–46, 32 S.Ct. 580, 56 L.Ed. 928 (1912).

judgment will not conclude private parties, when actual litigation brings to the court the question of the constitutionality of such legislation. In a legal sense the judgment could not be executed, and amounts in fact to no more than an expression of opinion upon the validity of the acts in question. Confining the jurisdiction of this court within the limitations conferred by the Constitution, which the court has hitherto been careful to observe, and whose boundaries it has refused to transcend, we think the Congress, in the act of March 1, 1907, exceeded the limitations of legislative authority, so far as it required of this court action not judicial in its nature within the meaning of the Constitution.

*Muskrat,* 219 U.S. at 361–62, 31 S.Ct. 250. Just as the United States had no interests adverse to the plaintiffs in *Muskrat,* here, the governor has no official interests adverse to the doctors and the clinics that have brought suit against him. Indeed, the doctors and clinics have not even alleged that the governor has acted adversely to them in any way.

The principle emanating from *Muskrat*—that parties lack constitutional standing to sue governmental entities solely to challenge the constitutionality of legislation—does not apply, however, when the plaintiffs sue a governmental official charged with specific duties in the enforcement of the challenged legislation. This point was made clear when, the year after *Muskrat,* the Supreme Court decided another suit involving the Cherokee Nation land. Levi B. Gritts, one of the named plaintiffs in *Muskrat,* was the captioned

plaintiff in *Gritts v. Fisher,* 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912). As in *Muskrat,* the plaintiffs brought suit arguing that the 1906 legislation (expanding the number of Cherokee Nation members that were to receive land) violated the plaintiffs' rights under the Constitution.[5] In *Gritts,* the Court proceeded to decide the case on the merits. The Court no longer found any jurisdictional problems; instead, it observed at the outset of its opinion that the defendants—the Secretary of the Interior and the Secretary of the Treasury—were "charged with important duties" in the allotment and distribution of the lands. *Gritts,* 224 U.S. at 642, 32 S.Ct. 580. Implicitly, the fact that the defendants were charged with the duties of enforcing the land distribution legislation created a conflict in which the defendants' interests were sufficiently adverse to the plaintiffs' interests so that the suit presented an Article III "Case" or "Controversy."

The lesson of *Muskrat* and *Gritts* is that Article III does not permit federal courts to entertain suits against sovereign governments for the simple purpose of challenging the constitutionality of legislation of that sovereign.[6] Instead, if a party seeks to enjoin enforcement of particular legislation, he must sue a government official charged with specific duties of enforcement relating to the legislation, that is to say, the official with whom a controversy has been or will be created. In any different situation, the federal courts would decide the constitutionality of legislative acts without the benefit of a defense from an interested party.[7]

---

**5.** Specifically, the plaintiffs argued that the 1906 Act "arbitrarily takes from the [plaintiffs] and others similarly situated property which is theirs and gives it to others, and therefore is violative of due process of law." *Gritts,* 224 U.S. at 646–47, 32 S.Ct. 580.

**6.** No sovereign immunity issue existed in *Muskrat* and *Gritts* because Congress had waived the United States' sovereign immunity by passing the 1907 Act that specified the United States as a defendant in suits challenging the legislation. *See Muskrat,* 219 U.S. at

350, 31 S.Ct. 250 (quoting that portion of the Act that specifies the United States as a defendant).

**7.** As the majority notes, the defendants in this case waived their right to a trial on the merits. This should be a clue that the named defendants are not the proper parties for a challenge to Act 825. It is rare indeed that a party, who continues to contest the merits of the case, will agree to waive the right to a trial. Surely a party who has a genuine stake in the availability of a cause of action under

This precedent, which so clearly rejects the majority's reasoning, has never been questioned by the Supreme Court in its opinions since *Muskrat* and *Gritts*. Neither has any federal appellate court questioned it. In fact, each of the several circuit courts that has addressed the issue has specifically concluded that plaintiffs cannot sue state officials in an attempt to test the constitutionality of state statutes when those state officials play no role in enforcement of the relevant statutes. *See 1st Westco Corp. v. School Dist. of Philadelphia*, 6 F.3d 108, 112–16 (3d Cir.1993) (finding "no case or controversy" between the plaintiff and state official-defendants when defendants had no enforcement responsibility other than their general duty to uphold the laws); *Southern Pacific Transp. Co. v. Brown*, 651 F.2d 613, 614 & n. 1 (9th Cir.1980) (concluding that the asserted injury-in-fact could not be traced to the attorney general, against whom relief was sought, when the plaintiff was challenging the constitutionality of a "nonpenalty provision" of Oregon's code); *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir.1979) ("The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute."); *Mendez v. Heller*, 530 F.2d 457, 460–61 (1976) (holding that the plaintiff's suit against state attorney general challenging the constitutionality of a civil statute "does not present the 'exigent adversity,' *Poe v. Ullman*, 367 U.S. 497, 506, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), which is an essential condition precedent to federal court adjudication"); *see also Socialist Workers Party v. Leahy*, 145 F.3d 1240 (11th Cir.1998) (finding that Florida's Secretary of State did have enforcement duties under the challenged statute, but also holding that the plaintiffs

had not brought an Article III "Case" or "Controversy" against various other state officials who had no duty to enforce the statute). Judge Friendly, writing for a three-judge, district court panel, has also rejected the majority's reasoning. *Gras v. Stevens*, 415 F.Supp. 1148, 1152 (S.D.N.Y. 1976) ("[W]e know of no case in which the general duty of a governor to enforce state laws has been held sufficient to make him a proper party defendant in a civil rights action attacking the constitutionality of a state statute concerning ... private civil actions."). I would think that we would consider the Supreme Court authority binding, the unanimity in the circuit courts indicative, and the voice of Judge Friendly highly persuasive.

## II

Article III's standing requirement is not the only constitutional bar to this case against Louisiana and its governor. Over one hundred years ago, the Supreme Court ruled that the Eleventh Amendment prohibits federal court jurisdiction when citizens challenge the constitutionality of a civil statute by suing state officials whose only duty to enforce the statute in question is their generic duty to enforce the laws of the state:

> There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged

Act 825—that is, a woman injured during an abortion procedure—would have taken on a more spirited defense of Act 825 and demanded that the plaintiffs prove their factual allegations at trial. It is also worth noting that the defendants also attempted to waive oral

argument before our court. These repeated waivers of rights by the defendants should raise some suspicion that there may not be an Article III case or controversy presented in this case.

to be unconstitutional. They were not expressly directed to see to its enforcement. *If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.* That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.

*Fitts v. McGhee,* 172 U.S. 516, 529–30, 19 S.Ct. 269, 43 L.Ed. 535 (1899)(emphasis added); *see also Ex Parte Young,* 209 U.S. 123, 155–57, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (quoting the above passage without questioning it and distinguishing the situation in *Fitts* because the case before the Court involved a challenge to a statute that the Attorney General was responsible for enforcing); *Sherman v. Community Consol. Sch. Dist. 21 of Wheeling Township,* 980 F.2d 437, 440–41 (7th Cir.1992) (Easterbrook, J.) (holding that the Eleventh Amendment requires the Attorney General to be dismissed as a party-defendant because he had "never threatened the [plaintiffs] with prosecution and as far as [the court could] tell [he had] no authority to do so"); *Children's Healthcare is a Legal Duty, Inc. v. Deters,* 92 F.3d 1412, 1414–18 (6th Cir.1996) (holding the *Ex Parte Young* exception to Eleventh Amendment did not apply because the state Attorney General's obligation to execute the laws was not a sufficient connec-

tion to the enforcement of the challenged statutes); *Gras,* 415 F.Supp. at 1152 (Friendly, J.) (discussing *Fitts* and *Ex Parte Young* ). In short, the Eleventh Amendment prohibits the federal courts from entertaining suits like this one brought against a defendant official with no enforcement authority over the challenged statute.

## III

With all due respect, it seems indisputable to me that the majority has disregarded the clear restrictions upon our judicial power under Article III and the Eleventh Amendment. The majority's view on our authority to decide the merits of this case is not supported by either Supreme Court precedent or our own precedent.

I therefore respectfully dissent.